**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID ADAMS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **07 CV 3980** |
| **v.** | ) | |
| | ) | **Judge Pallmeyer** |
| **CITY OF CHICAGO,** | ) | **Magistrate Judge Valdez** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSES TO CITY OF CHICAGO's LOCAL RULE 56.1(a)(3)**
**STATEMENT OF UNCONTESTED MATERIAL FACTS**

Plaintiff, David Adams, by his attorneys, submits the following responses to defendant's

Local Rule 56.1 Statement of Uncontested Facts (SOF) in support of his response to Defendant's

Motion for Summary Judgment:

**I.     JURISDICTION, VENUE AND PARTIES**

1.      On March 31, 2008, plaintiff David Adams ("Adams") filed his Third Amended

Complaint pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12112, 12203 et seq. (Third

Amended Complaint ("TAC"), ¶ 1, attached as Exhibit ("Ex.") A; Answer to Plaintiffs Third

Amended Complaint ("Ans. TAC"), ¶ 1, attached as Ex. B.)

**RESPONSE**:

    **Admit.**

2.      This Court has jurisdiction over Adams' claims pursuant to 28 U.S.C. §§ 1331, 1343.

(Ex. A, TAC, ¶ 2; Ex. B, Ans. TAC, ¶ 2). Venue is proper in the Northern District of Illinois, Eastern

Division, pursuant to 28 U.S.C. § 1391(b). (Ex. A, TAC, ¶ 3; Ex. B, Ans. TAC, ¶ 3).

**RESPONSE**:

**Admit.**

3.      Adams was employed by the City in the Department of Planning and Development ("DPD") from June 1, 1999 until his termination became effective on August 5, 2005. (Ex. A, TAC, ¶¶ 15, 24; Ex. B, Ans. TAC, ¶¶ 15, 24, Deposition of David Adams ("Adams Dep."), 19:9-12, 153:16-18, attached as Ex. C).

**RESPONSE**:

**Admit.**

II.      **THE DEPARTMENT OF PLANNING AND DEVELOPMENT**

4.      Within the DPD there are several divisions, including the Administrative Services Division. (Ex. C, Adams Dep., 33:24-34:4; Deposition of David Wells ("Wells Dep."), 27:8-13, 29:8-30:18, attached as Ex. D). The Administrative Services Division was comprised of the Office Operations Unit, which managed the DPD's vehicles, equipment, telephones, and supplies, and later the Fiscal Unit. (Deposition of Nikki Bravo ("Bravo Dep."), 19:5-9, 20:2- 22:1, attached as Ex. E). The Fiscal Unit processes invoices, performs accounting and record keeping, prepares fiscal reports, prepares the budget for the DPD, reviews contracts, and administers grants. (Ex. E, Bravo Dep., 22:2-7; Deposition of Leonard Obilor ("Obilor Dep."), 33:8-20, attached as Ex. F).

**RESPONSE**:

**Admit.**

5.      On March 21, 2001, David Wells ("Wells") became the Managing Deputy Commissioner of the DPD. (Ex. A, TAC, ¶ 19; Ex. B, Ans. TAC, ¶ 19; Ex. D, Wells Dep., 22:17-23:1). In late 2002, Nikki Bravo (`Bravo"), the Assistant Commissioner of the Administrative Services Division since June 1, 2000, was assigned the responsibility of overseeing the Fiscal Unit.

2

(Ex. A, TAC, ¶ 19; Ex. B, Ans. TAC, ¶ 19; Ex. E, Bravo Dep., 18:12-17, 19:10-12, 20:2-22:1, 45:21-24, 49:8-13, 50:3-12). Bravo reported to Wells until he transferred to another City department on May 31, 2007. (*See* Ex. A, TAC, ¶ 19; Ex. B, Ans. TAC, ¶ 19; Ex. D, Wells Dep., 25:5-13, 26:13-20).

**RESPONSE**:

**Admit, however, Def's Ex. B, Ans. TAC, ¶ 19 states that Mr. Wells became Managing Deputy Commissioner of the DPD on March 1, 2001, not March 21st .**

6.      In 2001, Adams transferred to the Fiscal Unit of the Administrative Services Division, as an Accountant IV. (Ex. A, TAC ¶¶ 15-16; Ex. B, Ans. TAC, ¶¶ 15-16). Since then, Adams was assigned primarily to process the vouchers from the Real Estate Division. (Ex. C, Adams Dep., 28:2-18, 79:13-20). Adams' other duties included securing funding for projects, reporting on the DPD's financial position, and preparing budget reports. (Ex. C, Adams Dep., 20:1-18, 22:13-23:4, *see* Adams' Deposition Ex. No. 1, Bates No. DA00145).

**RESPONSE**:

**Admit.**

7.      Rosendo Mota ("Mota") was the only other Accountant IV in the Fiscal Unit. (Ex. C, Adams Dep. 22:23-23:15). Half of Mota's work included processing the vouchers for another DPD division. (Deposition of Rosendo Mota ("Mota Dep."), 11:21-12:6, attached as Ex. G). Mota's assignments also included handling the revenue, petty cash, and working on special reports upon request. (Ex. G, Mota Dep., 8:16-9:23, 28:24-30:20; Ex. C, Adams Dep., 20:1-18, 22:13-23:4). In completing his revenue work, Mota created monthly reports of all City land sales; transferred security deposits to the Balance Sheet Account; reconciled the accounts to ensure sufficient funds

for property taxes; and transferred money to the Voucher Account for future bills. (Ex. G, Mota's Dep., 29:5-22).

**RESPONSE**:

    **Admit.**

8.      On August 2, 2004, Leonard Obilor ("Obilor") became the Director of Finance of the Fiscal Unit and the direct supervisor of the Fiscal Unit employees, including Adams and Mota. (*See* Ex. A, TAC, ¶ 21; Ex. B, Ans. TAC, ¶21; Ex. F, Obilor Dep., 27:24-28:5; Ex. G, Mota's Dep., 9:7-22). Prior to Obilor, Margaret Wilson ("M. Wilson") was Adams' direct supervisor in the Fiscal Unit from February 9, 2002, until her retirement on March 31, 2004. (*See* Ex. A, TAC, ¶ 17; Ex. B. Ans. TAC, ¶ 17**;** Ex. E, Bravo Dep., 23:9-24:13). Prior to M. Wilson, Adams was supervised by Jarese Wilson (J. Wilson). (Ex. C, Adams Dep., 162:23-164:20). Both M. Wilson and then Obilor reported to Bravo. (Ex. E, Bravo Dep., 23:9-24:13).

**RESPONSE**:

    **Admit, however, Def's Ex. B, Ans. TAC, ¶ 17 states that Mr. Singletary was plaintiff's immediate supervisor between 1999 and February 8, 2002, not Jarese Wilson.**

    **III.    ADAMS' WORK PERFORMANCE AND DISCIPLINE**

9.      Adams characterized his work performance for the DPD as "excellent" from 2002 through his termination in 2005. (Ex. C, Adams Dep., 162:12-22). During that same time, Adams received eight disciplinary actions from five different supervisors including a verbal reprimand, an oral reprimand, suspensions, and, ultimately, termination. (Ex. C, Adams Dep., 156:17-157:7, 162:23-164:20, 165:12-168:9, 173:16-174:12, 180:10-23, 189:3-190:13, 199:9-200:4, 201:14-202:8). Adams admitted he was disciplined for similar actions before and after Obilor

4

supervised him. (Ex. C, Plt's Dep., 250:6-251:13).

**RESPONSE**:

       **Plaintiff admits that he characterized that his work performance for the DPD was excellent from 2002 until his termination in 2005. Plaintiff denies that he was a recipient of eight disciplinary actions initiated by five different supervisors. Plaintiff will respond to each alleged disciplinary action that is specifically cited in defendant's subsequent Statement of Facts. Plaintiff denies that he was disciplined for similar actions before and after Obilor supervised him. Plaintiff, does admit that defendant would charge plaintiff with "boiler plate" language for perceived actions of misconduct. Thus, claims such as "insubordination" or "conduct unbecoming an officer or public employee" appear in two instances prior to Obilor's transfer to the Fiscal Unit. However, all of the discipline occurred while Bravo was overall supervisor of plaintiff's division. (Plf's Ex.1, Bravo Dep.,21:5-22:1).**

       10.    Adams was a member of the American Federation of State, County, and Municipal Employees (the "union") throughout his employment for the City. (Ex. C, Adams Dep., 92:10-93:14; Ex. E, Bravo Dep., 171:4-23). Under the Collective Bargaining Agreement between his union and the City, the DPD progressively disciplined union members. (Ex. C, Adams Dep., 92:10-93:14; Ex. E, Bravo Dep., 168:18-171:23; Ex. G, Mota Dep., 17:7-18:1; Deposition of Beverly Giovenco ("Giovenco Dep."), 12:10-13:2, attached as Ex. H). As a union member, Adams could initiate a grievance. (Ex. G, Mota Dep., 14:11-17:15).

**RESPONSE**:

       **Plaintiff objects based on relevancy. Notwithstanding, plaintiff admits that he was a member of AFSCME during his employment with the defendant. Plaintiff denies that the**

Agreement between the AFSCME and the City of Chicago provides the requisites of applying progressive discipline to members of AFSCME. (Agreement between AFSCME and City of Chicago ("Agreement"), Article 20, attached as Plf's Ex.2; Plf's Ex. 4, Mota Dep., 18:21-19:7). Plaintiff denies that as a union member he could initiate a grievance as a result of his discharge. (Plf's Ex.2, Agreement, Article 21).

### A. Disciplinary Record from 2002 to August 2004

11. On May 17, 2002, Adams' immediate supervisor at the time, J. Wilson, gave Adams a verbal warning because his assignments were three to four weeks past due. (Ex. C, Adams Dep., 162:23-164:20). J. Wilson memorialized the verbal warning in an e-mail to Adams, sent later that day. (Ex. C, Adams Dep., 162:23-164:20; *see* Adams' Deposition Ex. 9, Bates No. DA00153).

RESPONSE:

Plaintiff denies that J. Wilson was plaintiff's immediate supervisor at the time he received a verbal warning on May 17, 2002 regarding a perceived below average performance. (Def's Ex. B, Ans. TAC, ¶ 17; Def's Ex. C1, Adams Dep., Exhibit 9). Plaintiff's workload greatly increased because of the recent acquisition of the Real Estate Division by the DPD. (Deposition of Tina Drews ("Drews Dep") attached as Plf's Ex.3, 17:16-19:17; Mota Dep., attached as Plf's Ex. 4, 10:12-21). In the verbal warning, Ms. Wilson recognized that plaintiff needed assistance to meet the deadlines and offered to discuss which assignments needed assistance at weekly follow-up meetings. Of course, if the added assistance did not improve performance she would consider further disciplinary action. (Def's Ex. C1, Adams Dep., Exhibit 9).

12. On April 8, 2003, Bravo found Adams engaged in discourteous treatment and issued

him a written reprimand for violating Personnel Rule XVIII, Section I, Article 23 (discourteous treatment), Article 25 (insubordination), and Article 50 (conduct unbecoming). (Ex. C, Adams Dep., 165:12-167:13; see Adams' Deposition Ex. 10, Bates No. DA00161). Adams did not grieve the written reprimand. (Ex. C, Adams Dep., 167:6-13).

**RESPONSE**:

Plaintiff admits that Bravo charged plaintiff with the offence of discourteous treatment and issued him a written reprimand for violating Personnel Rule XVIII, Section I, Article 23 (discourteous treatment), Article 25 (insubordination), and Article 50 (conduct unbecoming) but denies that he engaged in discourteous treatment. Plaintiff further moves to strike SOF # 12. Said SOF fails to state what, if any, wrong doing plaintiff committed and fails to provide any specific facts of conduct which could be considered "discourteous treatment". Plaintiff admits that he did not "grieve" the written reprimand.

13.     Five months later, on September 5, 2003, M. Wilson found Adams engaged in discourteous treatment and issued him a three-day suspension for violating Personnel Rule XVIII, Section I, Article 23 (discourteous treatment), Article 25 (insubordination), and Article 50 (conduct unbecoming). (Ex. C, Adams Dep., 167:22-168:12; see Adams' Deposition Ex. 11, Bates No. DA00155). Adams did not grieve this suspension. (Ex. C, Adams Dep., 168:23- 169:8).

**RESPONSE**:

Plaintiff denies that M. Wilson found Adams to have engaged in discourteous treatment. However, Plaintiff admits that Bravo charged plaintiff with the identical rule violation that she charged plaintiff on April 8, 2003, i.e., of discourteous treatment and issued him a three-day suspension for violating Personnel Rule XVIII, Section I, Article 23

7

**(discourteous treatment), Article 25 (insubordination), and Article 50 (conduct unbecoming)**
**but denies that he engaged in discourteous treatment. (Plf's Ex. 5, Adams Dep., 167:22-168:12;**
**see Adams' Deposition Ex. 11, Bates No. DA00155). Plaintiff further moves to strike SOF #**
**13. Similar to SOF #12, SOF # 13 fails to state what, if any, wrong doing plaintiff committed**
**and fails to provide any specific facts of conduct which could be considered "discourteous**
**treatment". Plaintiff admits that he did not "grieve" the written reprimand.**

14.     On January 23, 2004, after discussions with Adams' union representative, M. Wilson
agreed to send Adams to counseling in lieu of disciplinary action for sending out an improper e-mail
to the Director of Acquisitions in the DPD's Real Estate Division. (Ex. C, Adams Dep.,
171:2-172:24, 173:16-174:12, see Adams' Deposition Ex. 14, Bates No. DA00158). Adams
responded to an inquiry from the Real Estate Division to the Director of Acquisitions and carbon
copied six employees in which Adams questioned how effectively the Director of Acquisitions
tracked City property. (Ex. C, Adams Dep., 171:2-172:24). Adams did not grieve the counseling.
(Ex. C, Adams Dep., 174:1-12, 178:24-179:7; see Adams' Deposition Ex. 14, Bates No. DA00158).

**RESPONSE**:

**Plaintiff admits that after discussions that were held at the pre-disciplinary meeting on**
**January 23, 2004 which was attended by Beverly Giovenco, Nikki Bravo, Adams and his union**
**representative, Adams agreed to attend a PSP session to avoid receiving any discipline for**
**sending an e-mail in response to an inquiry. (Plf's Ex.5 Adams Dep. , 174:1-12, 177:24-178:23).**
**Plaintiff denies that the e-mail was improper, denies that he was responding to an e-mail from**
**the Director of Acquisitions and further states that he only copied his response to those**
**individuals that were copied in the original e-mail inquiry. (*see* Plf's Ex. 5, Adams' Deposition**

**Ex. 13, subject e-mail received and sent, Bates No. DA00157).**

15.     On April 5, 2004, Bravo e-mailed Adams to remind him to promptly process the vouchers he receives and about his unacceptable behavior during a meeting, in which Adams took his shoes off, put his feet up on a chair, and later fell asleep. (Ex. C, Adams Dep., 275:7-276:3; (*see* Adams' Deposition Ex. No. 31, Bates No. DA00229; Ex. E, Bravo Dep., 91:20- 93:18). Adams admitted that he took his shoes off but claimed he thought it was an "informal meeting" and that cold medication had made him drowsy. (Ex. C, Adams Dep., 276:1-19). In his e-mail to his supervisor, Adams accused Bravo of "intentionally trying to aggravate" him. (Ex. C, Adams Dep., 275:7-276:19). Bravo informed Adams in writing that this behavior was not acceptable, but she did not discipline him for his actions. (Ex. C, Adams Dep., 276:20-23).

**RESPONSE**:

    **Admit.**

    **B.     Obilor's Policies**

16.     When Obilor began working as the Director of Finance, he instituted new policies including the creation of a central filing system so that all the vouchers could be tracked. (Ex. C, Adams Dep., 209:14-214:4; Ex. F, Obilor Dep., 52:2-55:9). Additionally, Obilor required each voucher to list the property's PIN number, as well *as* the property's address. (Ex. G, Mota's Dep., 12:12-24). All employees who processed vouchers were required to include the PIN number on each voucher. (Ex. G, Mota's Dep., 12:12-24).

**RESPONSE**:

    **Plaintiff denies that all employees who processed vouchers were required to include the PIN number on each voucher but admits all remaining facts of SOF #16.**

9

17.      Also, Obilor required vouchers to be processed in five to ten *days.* (Ex. C, Adams Dep., 23:21-24:22, 69:11-71:10, 73:9-78:2; Ex. F, Obilor Dep., 144:23-145:5). Obilor reissued the DPD's "Request for Payment Process" that was updated on January 30, 2004, which established a five-to-ten day payment processing of vouchers. (Ex. C, Adams Dep., 23:21-24:22, 73:9-78:2). Adams received a copy of the Request for Payment Process. (Ex. C, Adams Dep., 23:21-24:22).

**RESPONSE**:

**Admit, however, plaintiff was the only staff member disciplined if voucher was not processed in the time set for him. (Plf's Ex. 5, Adams Dep., 35:17-36:1, 38:7-39:11).**

18.      It could take Adams up to thirty days to process what he characterized as an "irregular invoice." (Ex. C, Adams Dep., 29:6-30:8). Adams says that he was able to get his work done and asked other employees if they needed help with their outstanding invoices once he finished his own. (Ex. C, Adams Dep., 37:3-19, 38:7-40:15; *see* Adams' Deposition Ex. No.32, ¶ 3 response; Plaintiffs Answers to Defendant's Interrogatories ("Adams Irrogs. "), Answer No. 2, ¶ 10, attached as Ex. I).

**RESPONSE**:

**Admit**

19.      Obilor required all of his employees to submit to him for review their e-mails to other divisions before sending them out. (Ex., F, Obilor Dep., 89:5-16, 91:6-93:7; Ex. G, Mota's Dep., 13:1-17).

**RESPONSE**:

**Plaintiff admits that Obilor instituted a policy that required all his employees to submit to him for review their e-mails other correspondence to other divisions before sending them out, but further states that Obilor only strictly enforced the policy against the plaintiff. (Plf's**

10

**Ex. 5, Adams Dep., 69:7-10).**

20.     Obilor also required his staff to tell him when they wanted the assistance of an intern. (Ex. G, Mota's Dep., 13:1-17).

**RESPONSE**:

    **Admit.**

    **C. Further Misconduct**

21.     On August 18, 2004, Obilor issued Adams a one-day suspension for sending out another inappropriate e-mail to the Director of Acquisitions in the DPD's Real Estate Division. (Ex. C, Adams Dep., 180:10-23, 183:4-184:16; see Adams' Deposition Ex. No. 21, Bates No. DA00167). The Director of Acquisitions requested information from Adams. (Ex. C, Adams Dep., 181:8-183:3, 185:13-186:4). Adams replied to everyone on the e-mail, including individuals that did not work for the DPD, with the requested information and then questioned how the Director of Acquisitions tracked the information. (Ex. C, Adams Dep., 181:8-183:3). The Deputy Director of the DPD's Real Estate Division replied to Adams, asking why the Real Estate Division gets a "hostile response" from Adams every time they request information from him. (Ex. C, Adams Dep., 183:4-186:4; Ex. F, Obilor Dep., 73:19-74:18, 77:13-19, 78:13-19).

**RESPONSE**:

    **Plaintiff admits that on August 18, 2004, Obilor issued Adams a one-day suspension for sending an e-mail to Blanca Beauchamp from the Real Estate Division of the DPD in response to a request for information regarding the status of three check requests. This request was sent by e-mail to Nikki Bravo on August 8, 2004 and copied four individuals, including Obilor and Wells. Bravo responded six days later and stated that Beauchamp would receive a status the**

next day.  **Plaintiff provided the information requested and made an inquiry on how Beauchamp tracks this information since he assumed that Julie Bengston, the individual who receives and deposits the check from the law department, would advise Beauchamp about the status of the check requests.  It was the three paragraph reply from the Head of the Real Estate Division (Ms. Rhee) that was hostile. Plaintiff denies that his response was hostile or out-of-line in any way. (Plf's Ex. 5, Adams Dep., 184:18-185:22, 185:24-186:8; *see* Plf's Ex. 5, Adams' Deposition Ex. No. 17, Bates No. DA00163).  Obilor testified that, other than Rhee's reaction to plaintiff's e-mail, he did not find anything that was hostile, objectionable, or unprofessional about the e-mail.  (Deposition of Leonard Obilor ("Obilor Dep.") attached as Plf's Ex. 6, Obilor Dep., 85:21-88:15).**

22.     The DPD determined that Adams' inappropriate e-mail response to a request for information from the Director of Acquisitions violated Personnel Rule XVIII, Section 1, Article 23 (discourteous treatment), Article 25 (insubordination), and Article 50 (conduct unbecoming) and issued him a one-day suspension. (Ex. C, Adams Dep., 186:5-188:9, 198:12-21; see Adams' Deposition Ex. No. 21, Bates No. DA00167; Ex. F, Obilor Dep., 88:16-20, 97:2-18). After a pre-disciplinary meeting, with his union representative present, Obilor issued him a one-day suspension. He did not grieve the one-day suspension. (Ex. C, Adams Dep., 186:14-187:13, 202:12-18).

**RESPONSE**:

**Plaintiff admits to all except denies that said e-mail response was inappropriate. Plaintiff further moves to strike the last sentence in SOF# 22 regarding the issue of whether plaintiff "grieved" the one-day suspension based on relevancy.**

12

23.     On September 30, 2004, Obilor issued Adams a seven-day suspension for leaving the office without authorization; not following procedure when completing invoices; and slamming the door and yelling across the office after receiving his pre-disciplinary notice. (Ex. C, Adams Dep., 190:6-193:21, see Adams' Deposition Ex. Nos. 19, Bates No. DA00170, and 20, Bates No. DA00171). Adams left the office to pick up checks from the Comptroller's office without receiving express authorization from Obilor. (Ex C, Adams Dep., 194:1-195:14; Ex. F, Obilor Dep., 102:16-104:12).

**RESPONSE**:

**Plaintiff admits that Obilor issued him a seven-day suspension claiming that Adams left the office with out authorization, failed to follow procedure when completing invoices and slammed a door and yelled across the office after receiving a pre-disciplinary notice. Plaintiff admits that he left the office to pick up checks from the Comptroller's office after informing Obilor that he received a call from the Law department that there were checks for him to pick up and that he was going to the Comptroller's office to get them.  Obilor was entering Roshanda Barkstale's office (an employee in the Fiscal Unit) and slammed the door on his face. Plaintiff then proceeded to the Comptroller's office after asking other employees in his unit if they had any checks for him to pick up since he was going. (Plf's Ex. 5, Adams Dep., 194:1-196:15).  By informing Obilor, plaintiff was not in violation of Obilor's procedure. (Plf's Ex. 6, Obilor Dep., 106:16-23). Plaintiff denies that he slammed a door, yelled across the office when he received his suspension notice or failed to follow procedure when completing invoices.**

24.     The DPD determined that Adams' conduct violated Personnel Rule XVIII, Section 1, Article 2 (leaving the office without authorization), Article 23 (discourteous treatment), Article

25 (insubordination), Article 29 (failure to complete assignment), Article 39 (incompetence and inefficiency), and Article 50 (conduct unbecoming); and he was suspended for seven days. (Ex. C, Adams Dep., 190:6-192:8; *see* Adams' Deposition Ex. No. 19, Bates No. DA00170; Ex. F, Obilor Dep., 111:24-112:7, 114:8-19). After a pre-disciplinary meeting with his union representative present, Obilor issued him a seven-day suspension, which Adams did not grieve. (Ex. C, Adams Dep., 196:12-197:18, 202:12-15).

**RESPONSE**:

**Plaintiff denies that he violated any of the specific Articles of the Personnel Code. Plaintiff admits that said charges were made against him and that he was assessed the seven day suspension.  Plaintiff further moves to strike the last phrase of the last sentence in SOF# 24 regarding the issue of whether plaintiff "grieved" the seven-day suspension based on relevancy.**

25.    On November 22, 2004, Obilor issued Adams a twenty-nine day suspension for failing to timely process invoices with overrides to the Department of Procurement Services; failing to record processed vouchers in a timely fashion; failing to provide accurate information for the budget; failing to comply with the five-day payment processing rule; and failing to complete the audit of the Strategic Neighborhood Investment Fund ("SNIF"). (Ex. C, Adams Dep., 201:14-202:8, 209:2-210:15, 214:11-219:21; see Adams' Deposition Ex. No. 26). In August 2004, Obilor issued the Fiscal Unit a memorandum stating that the intern, Nikki Arrington ("Arrington"), would file invoices into a central filing system; however the employee assigned to process the invoice remained responsible for ensuring that the information was filed accordingly. (Ex. C, Adams Dep., 209:14-213:22). Adams received a copy of this memorandum in August 2004. (Ex. C, Adams Dep.,

14

210:22-212:16; see Adams' Deposition Ex. No. 27, Bates Nos. DA00149-150). Adams does not dispute the voucher was not timely filed. (Ex. C, Adams Dep., 209:2-210:15, 213:11-214:10; Ex. F, Obilor Dep., 131:14-134:2).

**RESPONSE**:

  **Plaintiff admits that Obilor issued him a twenty-nine day suspension but denies that any of the charges have merit. First, Obilor charged plaintiff with "Failure to process and include Great Realty Advisors, Gibbon & Gibbon invoices with list of overrides submitted to Procurement Services for processing, as was requested. This is a violation of Personnel Rules #29 and #39." Originally, Obilor claimed the violation occurred on October 7, 2004. Plaintiff could not have committed the infraction on that date since he was still on suspension. (see Plf's Ex. 5, Adams' Deposition Ex. No. 19, Bates No. DA00170). After Obilor became aware of the impossibility that Adams committed said infraction, he revised the notice of discipline on December 10, 2004. The new date of infraction was changed to October 18, 2004.(see Plf's Ex. 5, Adams' Deposition Ex. No. 25, Bates No. DA00193; see Memorandum dated Nov. 22, 2004 attached as Plf's Ex. 7; Plf's Ex. 6, Obilor Dep., 127:6-128-24; see Plf's Ex. 6, Obilor's Deposition Ex. No. 12, Bates Nos. DA00927-00928). Plaintiff had never seen this revised notice of discipline until the date of his deposition. (Plf's Ex. 5, Adams Dep., 207:2-208:14). When plaintiff returned from suspension on October 8, 2008, nothing was done in his absence. He had told Obilor that his work was backed up and needed time. Obilor offered no assistance even though his policy is to provide one of the interns to help if requested by the staff member. (see Def's SOF # 20). Obilor also had a policy in place that if plaintiff was not available, no one would assume his duties and responsibilities unless it was an emergency and his unit**

**needed to react to it.  (Plf's Ex. 6, Obilor Dep., 112:8-128-23). Moreover, Obilor admitted that if plaintiff had to go through override process to complete processing the payment vouchers, he would not penalize plaintiff if it takes him more time than usual. (Plf's Ex. 6, Obilor Dep., 158:2-24).**

26.     At the November 22, 2004 pre-disciplinary meeting, Adams was also charged with not timely processing a check request because he could not find it on his desk. (Ex. C, Adams Dep., 214:11-21). To process a check request, Adams first had to set up a funding strip with the Budget Department in order to receive payment. (Ex. C, Adams Dep., 214:14-215:11). Adams did set up a funding strip for this check request, but then could not find the check request. (Ex. C, Adams Dep., 214:11-21). Adams "guess[es]" that the overdue check request was planted on his desk because when Obilor came over to help Adams look, Obilor found it on Adams' desk. (Ex. C, Adams Dep., 215:12-216:15; Ex. F, Obilor Dep., 134:3-18).

<u>**RESPONSE**</u>:

**Plaintiff admits that he was charged with not timely processing a check request because he could not find it on his desk. He admits that he had set up a funding strip with the Budget department and thereafter could not find the check request on his desk.  Plaintiff also states that he had done a thorough search of his desk and the desks of his co-workers without success on Friday, November 12, 2004 after receiving a call from Julie Bengston from the Law Department about a check request  He checked his file and then searched his desk. He informed Obilor that he had a check request missing and Obilor told plaintiff to just make another request.  On Monday, November 15, 2004, Obilor asked plaintiff if he ever found the check request and if plaintiff had checked his desk.  Plaintiff stated that he did check his desk.**

16

**Obilor instructed the plaintiff to follow him to plaintiff's desk and Obilor just pulled out the missing check request from a stack of papers that plaintiff had just placed on his desk on the previous Friday.  Because Obilor pulled out the check request so quickly after he instructed the plaintiff to follow him right to plaintiff's desk, plaintiff suspected Obilor placed the check request on plaintiff's desk.  (Plf's Ex. 5, Adams Dep., 215:18-216:15; *see* Plf's Ex. 5, Adams' Deposition Ex. No. 26, p. 1-2).**

27.    Next, Obilor had requested Adams to talk to the Director of Acquisitions for the Real Estate Division and compile a list of the properties that the City had acquired for the budget report. (Ex. C, Adams Dep., 216:16-217:5; Ex. F, Obilor Dep., 134:19-137:17). In Adams' rebuttal to the November 22, 2004 pre-disciplinary meeting, Adams admitted that he missed one property that he should have included in the list for the budget report. (Ex. C, Adams Dep., 217:6-17).

RESPONSE:

**Plaintiff generally, admits to Def's SOF # 27.  However, plaintiff adds the following: At 9:00 a.m. on November 16, 2004, Obilor asked plaintiff for a list of land acquisitions for 2004.  Obilor claimed he needed the information by noon.  It was plaintiff who suggested that Obilor talk to Director of Land Requisitions and get their list and compare it with plaintiff's list which Obilor did.  Plaintiff's list did not contain a property that was acquired by condemnation.  This property would be listed in the Land Acquisitions section and not in plaintiff's voucher log since he did not prepare any check vouchers relating to this parcel of land.  Normally, on any land acquisition, plaintiff would be asked to process check vouchers to Chicago Title Insurance (Title Insurance) and/or Cook County Treasurer (Transfer Tax) which are usual costs for real estate closings. (Plf's Ex. 5, Adams Dep., 216:6-217:7; *see* Plf's**

**Ex. 5, Adams' Deposition Ex. No. 26, p. 2). Plaintiff would not have this acquisition in his records. It was an omission, not an oversight. The omission was caught well in advance of the Budget meeting which was set for November 18, 2004. *(Id.)***

28. Adams did not process a payment within the required time period. (Ex. C, Adams Dep., 217:18-218-16). Adams admits that he received the DPD's "Request for Payment Process" that was updated on January 30, 2004, which established a time frame for the processing of vouchers and that he followed the payment process "[t]o the best of my knowledge and ability." (Ex. C, Adams Dep., 23:21-24:22, 217:18-218:16, see Adams' Deposition Exhibit No. 2, Bates No. DA00146).

**RESPONSE**:

    **Plaintiff denies Def's SOF # 28. The charge against the plaintiff is that he failed to comply with the five-day rule. Defendant has neither identified which specific voucher request was untimely processed at the pre-disciplinary meeting nor in this Motion for Summary Judgment. Whereas, plaintiff maintains that he was asked to create overrides on contracts that have expired. Based upon the Override Procedure for Contracts which was in affect on November 16, 2004, a five day turnaround is not required or possible. (Plf's Ex. 8). Obilor recognizes that a greater time period is necessary to process payment when an override is required. (Plf's Ex. 8). Moreover, plaintiff states that normal paying processing rule allows ten days. (Plf's Ex. 5, Adams Dep., 74:7-77:6; *see* Plf's Ex. 5, Adams' Deposition Exhibit No. 2, Bates No. DA00146).**

29. Finally, Adams never completed another assignment, updating the SNIF account. (Ex. C, Adams Dep., 218:17-219:17; Ex. F, Obilor Dep., 138:11-23). As an Accountant IV, one of Adams' responsibilities was to audit internal and external accounts for monies expended and

received. (Ex. C, Adams Dep., 20:24-23:4; *see* Adams' Deposition Ex. No. 1, Bates No. DA00145).

In his rebuttal to the November 22, 2005 pre-disciplinary meeting, Adams admits he was required

to audit the SNIF account, but never finished. (Ex. C, Adams Dep., 218:17-219:14; Ex. F, Obilor

Dep., 138:11-139:13).

**RESPONSE**:

**Plaintiff denies that he was assigned to update the SNIF account. Obilor had requested plaintiff to audit the Strategic Neighborhood Investment Fund. It is a very large fund containing many different accounts. (Plf's Ex. 5, Adams Dep., 218:22-219:1). Prior to this request, Plaintiff had never before performed an audit on the SNIF. (*Id.*, 219:15-17). Plaintiff had to recreate information from an outdated program, CAPS, and needed assistance from Steve Hughes, a co-worker.(*Id.* 219:15-17; *see* Plf's Ex. 5, Adams' Deposition Ex. No. 26, p. 4 and Ex. 1). In spite of plaintiff's workload, he was able to provide Obilor with the information to start the audit. Obilor was aware that plaintiff had to recreate information to utilize CAPS. (*Id.*). Moreover, there is an inherent conflict of interest for an accountant to audit an account that to which he is assigned. (*see* Plf's Ex. 5, Adams' Deposition Ex. No. 26, p. 4).**

30.    After the November 22, 2004 pre-disciplinary meeting, the DPD determined that

Adams' conduct violated Personnel Rule XVIII, Section 1, Article 29 (failure to complete

assignment) and Article 39 (incompetence or inefficiency) and issued Adams a twenty-nine day

suspension. .(Ex. C, Adams Dep., 201:14-202:5; *see* Adams Deposition Ex. 23, Bates No. DA00181;

Ex. F, Obilor Dep., 160:7-24). Adams grieved the twenty-nine day suspension and it was settled for

a four-day reduction of the suspension from twenty-nine days to twenty-five days. (Ex. C, Adams

Dep., 202:19-206:12, 159:7-161:4). Because of his pre-scheduled vacation, Adams' twenty-five day

suspension started on December 2, 2004 and ended on January 7, 2005, with Adams returning to work on January 10, 2005. (Ex. C, Adams Dep., 159:7-161:4, 201:14- 202:8; *see* Adams' Deposition Ex. 23, Bates No. DA00181; Ex. F, Obilor Dep., 164:1-13).

**RESPONSE**:

> **Admit.**

> **D. Further Performance Problems**

31.    The DPD had weekly Wednesday meetings where the Fiscal Unit staff would meet with their supervisor to discuss outstanding issues and vouchers. (Ex. C, Adams Dep., 59:21-63:9, 64:7-12; Ex. F, Obilor Dep., 165:15-166:15; Deposition of Tina Drews ("Drews Dep."), 31:23-33:6, attached as Ex. J). On June 15, 2005, at 12:44 p.m. an e-mail was sent to the staff, including Adams, reminding them to bring any outstanding vouchers to the weekly 2:00 p.m. meeting. (Ex. C, Adams Dep., 62:21-63:9, 271:6-22; see Adams' Deposition Ex. No. 29). Adams received the e-mail and showed up at the meeting, but without any of his outstanding documents. (Ex. C, Adams Dep., 271:6-22, 273:2-6). Adams claimed he was unable to print his outstanding vouchers from the F-Drive of his computer because of computer problems, which he said he reported to 4-DATA. (Ex. C, Adams Dep., 273:2-274:11).

**RESPONSE**:

> **Plaintiff admits to all of SOF # 31 except for the statement that the DPD weekly meetings were always held on Wednesdays. (Plf's Ex. 3, Drews Dep., 32:1-33:6).**

32.    The City's 4-DATA is a computer help desk from the City's Department of Business and Information Systems (`BIS") that fixes employees' computer systems. (Ex. C, Adams Dep., 273:10-274:11; Ex. D, Wells Dep., 54:22-55:13). Wells was an Assistant Chief Information Officer

in BIS before becoming the Managing Deputy Commissioner in the DPD. (Ex. D, Wells Dep., 18:24-19:10, 20:1-18, 54:20-55:13, 59:23-61:13). When an employee calls 4-DATA, he will be asked for his computer number and will go through solutions for routine problems. (Ex. D, Wells Dep., 54:22-55:21, 58:19-61:13, 70:3-71:3). Once 4-DATA receives this basic information, it opens a ticket, gives the employee the ticket number for future inquiries, and places the ticket in its queue. (Ex. D, Wells Dep., 54:22-55:21, 58:19-61:13, 70:3- 71:3).

**RESPONSE**:

  **Plaintiff neither admits nor denies SOF # 32. He is unaware of the internal procedures of 4-DATA.**

  33. After Adams realized he was unable to print his outstanding vouchers, he testified that he called 4-DATA before going to the 2:00 p.m. meeting on June 15, 2005. (Ex. C, Adams Dep., 273:2-274:11). At the weekly meeting, Adams told Obilor he was unable to print the necessary documents. (Ex. C, Adams Dep., 273:2-274:14; Ex. F, Obilor Dep., 190:17-192:1). Because Adams did not have his outstanding vouchers, Obilor asked Adams to leave the meeting. (Ex. F, Obilor Dep., 194:5-196:17).

**RESPONSE**:

  **Plaintiff admits to all of SOF # 33 except for the statement that "Obilor asked Adams to leave the meeting." Staff members at the meeting testified that Obilor slammed his fist on the table and yelled at plaintiff to get out. When plaintiff tried to explain, Obilor shouted to plaintiff to leave. (Plf's Ex. 3, Drews Dep., 23:13-24:11; Plf's Ex. 4, Mota Dep., 22:16-23:16).**

  34. Outside of the meeting, Adams saw Managing Deputy Commissioner Wells and told Wells about his computer problems with the F-Drive and that he was asked to leave the weekly

meeting. (Ex. D, Wells Dep., 54:1-55:21 75:9-82:6). Adams told Wells that he had already called 4-DATA, to report the problem. (Ex. C, Adams Dep., 273:2-2 1). Adams also told Wells that 4-DATA had given him a ticket number for his computer to be repaired. (Ex. D, Wells Dep., 54:1-55:21, 58:3-61:13, 75:9-82:6).

**RESPONSE**:

    **Admit**.

35.    Because Wells had worked for BIS, he knew he could escalate Adams' ticket number into a priority, so that Adams' F-Drive would be fixed faster. (Ex. D, Wells Dep., 54:1-61:13). While approaching Adams' desk to ask for the ticket number, Wells overheard Adams' talking with 4-DATA. (Ex. D, Wells Dep., 54:1-61:13, 75:9-82:6). Based on Adams' conversation with 4-DATA, Wells determined that Adams was just then initiating his computer claim with 4-DATA and had never received a ticket number as he had told Wells. (Ex. D, Wells Dep., 54:1-62:8, 69:23-71:3, 75:3-82:6).

**RESPONSE**:

    **Plaintiff neither admits nor denies the statement in the first sentence. Plaintiff admits the statement in the second sentence. Plaintiff admits that Wells determined that he was just then initiating his computer claim with 4-DATA and never received a ticket number as he had told Wells. Plaintiff, however, states that Wells' determination is incorrect.**

36.    Wells then asked Adams about why he was asked to leave the meeting. (Ex. D, Wells' Dep., 61:14-64:16, 69:23-71:3, 76:20-78:7). Wells questioned if Adams knew that the Fiscal Unit has a weekly meeting, and Adams answered "I don't know" several times out of frustration. (Ex. C, Adams Dep., Adams' Deposition Ex. No. 32, ¶ 5 response; Ex. I, Adams Irrogs., Answer No. 2, ¶

11). Adams then admitted to Wells that he was asked to leave the Fiscal Unit's meeting to discuss outstanding vouchers because he did not have the required documents. (Ex. D, Wells' Dep., 56:5-64:16; see Wells' Deposition Ex. No. 1).

**RESPONSE**:

      **Admit**.

37.     Based on his conversations with Adams, and the telephone conversation Wells': overheard between Adams and 4-DATA, Wells believed that Adams had not been honest about his computer problem. (Ex. D, Wells Dep., 61:14-65:24, 69:23-71:3, 75:3-82:6). During their first conversation Adams told Wells he had called 4-DATA before the meeting. (Ex. D, Wells Dep., 54:1-65:16, 69:23-71:3, 75:3-82:6). Wells investigated when 4-DATA opened a ticket to fix Adams' F-Drive. (Ex. C, Adams Dep., 272:6-274:11; Ex. D, Wells Dep., 75:3-82:6, 83:1- 88:12). Based on the investigation, Wells determined that 4-DATA opened a ticket for Adams' F-Drive computer problem at 2:58 p.m. on June 15, 2005, after the meeting rather than before as Adams told Wells. (Ex. C, Adams Dep., 273:16-274:11; Ex. D, Wells Dep., 83:1-88:12).

**RESPONSE**:

      **Plaintiff denies that Wells believed that plaintiff had not been honest about his computer problem. Wells admitted that he did not know whether plaintiff had a computer problem. (Plf's Ex. 9, Wells Dep., 64:17-66:2). Plaintiff admits that he told Wells that he had called 4-DATA before the meeting. Plaintiff denies that Wells' investigation resulted in a finding that plaintiff did not receive a ticket number prior to the meeting. Plaintiff stands by his sworn statement that he called 4-DATA before the meeting and called while Wells was present to confirm his original ticket number. (Plf's Ex. 5, Adams Dep., 273:2-19; *see* Adams'**

Deposition Ex. No. 30).

38.     Wells instructed Obilor and Bravo to discipline Adams for being dishonest about calling 4-DATA prior to the 2:00 p.m. meeting and for telling Wells, Adams' boss, that he was unaware that the Fiscal Unit had weekly meetings. (Ex. E, Bravo Dep., 157:2-160:13; Ex. D, Wells Dep., 71:14-21, 81:4-10). Because Adams had been progressively disciplined seven times, including a twenty-nine day suspension, the next step was termination. (Ex. C, Adams Dep., 156:17-157:7, 162:23-164:20, 165:12-168:9, 173:16-174:12, 180:10-23, 189:3-190:13, 199:9-200:4, 201:14-202:8; Ex. D, Wells Dep., 71:22-74:12). Wells contacted the City's Law Department to begin the termination process for Adams. (Ex. D, Wells Dep.,71:22-74:12; Ex. E, Bravo Dep., 157:2-159:7).

**RESPONSE**:

**Plaintiff admits that Wells instructed Obilor and Bravo to discipline Adams because of his stated belief that Adams was dishonest about calling 4-DATA prior to his 2:00 p.m. meeting and for Adams response, "I don't know" to the many rapid, successive questions directed to him by both Wells and Obilor. (*see* Plf's Ex. 5 Adams' Deposition Ex. No. 32). Plaintiff admits that he has been disciplined several times including a twenty-nine day suspension. Plaintiff denies that the next step was termination since he stated that the previous levels of discipline were unwarranted and undeserved.**

### E. Human Resources Board Upholds Termination

39.     On July 15, 2005, Adams was given the Statement of Charges and Explanation of Evidence ("Statement of Charges") explaining that his discharge was under consideration. (Ex. C, Adams Dep., 221:14-222:19; Adams' Deposition Ex. No. 28, DA00189-192; Ex. H, Giovenco Dep., 20:12-22:13). Adams was placed on paid administrative leave after he received the Statement of

Charges. (Ex. C, Adams Dep., 220:6-8; Affidavit of Nikki Bravo ("Bravo Aff."), ¶ 6, attached as Ex. K).

**RESPONSE**:

    **Admit**.

    40.    The first two charges of the Statement of Charges include Adams' statements "I am not a secretary" and "it's about to get ugly" to Obilor, in violation of Personnel Rule XVIII, Section I, Article 23 (discourteous treatment), Article 25 (insubordinate actions), and Article 50 (conduct unbecoming). (Statement of Charges, Nos. 1-2, Adams' Deposition Ex. No. 28, DA00189-192). The third charge of the Statement of Charges stated that on June 15, 2005, Adams failed to comply with a standard procedure that required employees to bring a list of outstanding vouchers to the weekly fiscal meetings .(Statement of Charges, No. 3, Adams' Deposition Ex. No. 28, DA00189-192). The DPD determined that Adams' conduct violated Personnel Rule XVIII, Section I, Article 29 (failure to take action needed to complete an assignment), Article 38 (inattention to duty), 39 (incompetence or inefficiency), Article 48 (violating departmental rules, regulations, or procedures), and Article 50 (conduct unbecoming). (Statement of Charges, No. 3, Adams' Deposition Ex. No. 28, DA00189-192).

**RESPONSE**:

    **Plaintiff admits that the first two charges of the Statement of Charges include allegations that plaintiff made statements "I am not a secretary" and "it's about to get ugly" to Obilor.  Plaintiff admits that the third charge of the Statement of Charges alleges that on June 15, 2005, Adams failed to comply with a standard procedure that required employees to bring a list of outstanding vouchers to the weekly fiscal meetings.  Plaintiff moves to strike the**

**findings of the DPD that plaintiff's conduct violated Articles of the Personnel Rules cited in SOF# 40 based on relevancy. Notwithstanding, plaintiff admits that the DPD found that plaintiff's conduct violated all of the Articles of the Personnel Rules cited in Def's SOF#40. Plaintiff denies that he made such statements. (Plf's. Ex. 5, Adams' Deposition Ex. No. 32).**

41. The next charge stated that on June 15, 2005, Adams refused to leave a weekly fiscal meeting to retrieve the list of outstanding vouchers after Obilor asked him to leave three times. (Statement of Charges, No. 4, Adams' Deposition Ex. No. 28, DA00189-192). The DPD determined that Adams' conduct violated Personnel Rule XVIII, Section I, Article 25 (insubordinate actions) and Article 50 (conduct unbecoming). (Statement of Charges, No. 4, Adams' Deposition Ex. No. 28, DA00189-192).

**RESPONSE**:

**Plaintiff admits that the next charge of the Statement of Charges alleges that on June 15, 2005, Adams refused to leave a weekly fiscal meeting to retrieve the list of outstanding vouchers after Obilor asked him to leave three times. Plaintiff moves to strike the findings of the DPD that plaintiff's conduct violated Articles of the Personnel Rules cited in SOF# 41 based on relevancy. Notwithstanding, plaintiff admits that the DPD found that plaintiff's conduct violated all of the Articles of the Personnel Rules cited in Def's SOF #41. Plaintiff denies that he refused to leave the fiscal meeting. (Plf's Ex 5, Adams' Deposition Ex. No. 32).**

42. The next charge stated that also on June 15, 2005, when Wells asked Adams about his failure to bring the list of outstanding vouchers to the weekly meeting, Adams falsely stated to Wells that he was not aware that the Fiscal Unit had weekly meetings. (Statement of Charges, No. 5, Adams' Deposition Ex. No. 28, DA00189-192). The DPD determined that Adams' conduct

26

violated Personnel Rule XVIII, Section I, Article 8 (false statements in an official investigation) and Article 50 (conduct unbecoming). (Statement of Charges, No. 5, Adams' Deposition Ex. No. 28, DA00189-192).

**RESPONSE**:

      **Plaintiff admits that the next charge of the Statement of Charges alleges that on June 15, 2005, when Wells asked Adams about his failure to bring the list of outstanding vouchers to the weekly meeting, Adams falsely stated to Wells that he was not aware that the Fiscal Unit had weekly meetings. Plaintiff moves to strike the findings of the DPD that plaintiff's conduct violated Articles of the Personnel Rules cited in SOF# 41 based on relevancy. Notwithstanding, plaintiff admits that the DPD found that plaintiff's conduct violated all of the Articles of the Personnel Rules cited in Def's SOF #42. Plaintiff denies that he made false statements to Wells as stated in SOF # 42. (Plf's Ex. 5, Adams' Deposition Ex. No. 32).**

43.      The final charge stated that on June 15, 2005, when Wells asked Adams about his failure to bring the list of outstanding vouchers to the weekly meeting, Adams falsely stated that he had contacted 4-DATA to report that he could not print from his computer before the 2:00 p.m. meeting. (Statement of Charges, No. 6, Adams' Deposition Ex. No. 28, DA00189-192). The DPD determined that Adams' conduct violated Personnel Rule XVIII, Section I, Article 8 (false statements in an official investigation) and Article 50 (conduct unbecoming). (Statement of Charges, No. 6, Adams' Deposition Ex. No. 28, DA00189-192).

**RESPONSE**:

      **Plaintiff admits that the final charge of the Statement of Charges alleges that on June 15, 2005, when Wells asked Adams about his failure to bring the list of outstanding vouchers**

to the weekly meeting, Adams falsely stated that he had contacted 4-DATA to report that he could not print from his computer before the 2:00 p.m. meeting. **Plaintiff moves to strike the findings of the DPD that plaintiff's conduct violated Articles of the Personnel Rules cited in SOF# 43 based on relevancy. Notwithstanding, plaintiff admits that the DPD found that plaintiff's conduct violated all of the Articles of the Personnel Rules cited in Def's SOF #43. Plaintiff denies that he made false statements to Wells as stated in SOF # 42. (Plf's Ex. 5, Adams' Deposition Ex. No. 32).**

44.    Adams issued a written response to the Statement of Charges. (Ex. C, Adams Dep., 277:6-278:15; see Adams' Deposition Ex. No. 32).

**RESPONSE**:

**Admit**.

45.    On August 5, 2005, Adams was discharged and he appealed his termination to the City's Personnel Board (now known as the Human Resources Board ("HRB")). (Ex. C, Adams Dep., 223:20-224:3). An attorney represented Adams at the HRB hearing. (Ex. C, Adams Dep., 223:23-224:8; *see* May 2, 2006, Hearing Officer's Report to HRB of the City of Chicago, 05 PB 120 ("the Report"), attached as Ex. K.

**RESPONSE**:

**Admit.**

46.    Employees in the Administrative Services Division testified as witnesses at Adams' HRB hearing. (Ex. C, Adams Dep., 225:7-12). Adams also testified "fully and truthfully exlain[ed]" his side of the story of the Statement of Charges. (Ex. C, Adams Dep., 225:13-17). No one ever said to Adams that he was terminated because he had HIV. (Ex. C, Adams Dep., 155:14-21).

**RESPONSE**:

> **Admit.  However, plaintiff moves to strike SOF # 46 based on relevancy.**

47.     On May 2, 2006, the Hearing Officer issued his findings and recommendation to the HRB. (Ex. K, the Report). The Hearing Officer found that the City did prove the charges 1, 2a, 3, 4, and 5 and recommended to the HRB that it uphold Adams' discharge. (Ex. K, the Report, pp. 13-14, No. 3-4). It found that the City did not prove charge 2b, because there was evidence that Adams could not access his F-Drive to retrieve the list of outstanding vouchers he was required to bring to the weekly meeting. (Ex. K, the Report, p. 13, No. 2). On June 14, 2006, after reviewing the record, the HRB adopted the findings and recommendation of the Hearing Officer and upheld Adams' discharge. (Findings and Decision of the HRB of the City of Chicago, 05 PB 120 ("HRB Findings"), p. 2, attached as Ex. L).

**RESPONSE**:

> **Admit.  However, plaintiff moves to strike SOF# 47  based on relevancy**.

### IV.     ADAMS' MEDICAL HISTORY

48.     Adams was diagnosed with Human Immunodeficiency Virus ("HIV") in 1993. (Ex. A, TAC, ¶ 14). Adams never told any of his co-workers or supervisors that he had HIV because it was personal and he did not want others to know. (Ex. C, Adams Dep., 144:21-145:7, 133:5-12, 239:10-14, 247:13-19). Adams' HIV symptoms consisted of loss of weight, excessive urination, and coughing. (Ex. C, Adams Dep., 95:4-20).

**RESPONSE**:

> **Admit**.

49.     In 1999, Adams had shingles, which he opines is related to his HIV, and it caused him

to miss five days of work. (Ex. C, Adams Dep., 97:23-99:19). Adams never told anyone at work that

he had shingles and Obilor, Wells, and Bravo were not working with Adams in 1999. (Ex. C, Adams

Dep., 96:16-97:7,107:18-20; Ex. E, Bravo Dep., 18:12-17, 19:10-12, 49:8-13; Ex. F, Obilor Dep.,

27:23-28:5; Ex. D, Wells Dep., 22:17-23:1). Adams' shingles have not reoccurred. (Ex. C, Adams

Dep., 105:19-23).

**RESPONSE**:

   **Admit.  (See also Plf's Ex. 5, Adams Dep., Exhibit 4 p. 1).**

   50.    In or around October 2000, Adams was diagnosed with pulmonary hypertension. (Ex.

C, Adams Dep., 117:7-119:3). According to Adams, pulmonary hypertension is "extremely rare" and

no one knows about it. (Ex. C, Adams Dep., 102:4-24).

**RESPONSE**:

   **Admit.  In addition, plaintiff reported worsening dyspnea five to six months prior to**

**his diagnosis of pulmonary hypertension.  (Plf's Ex. 5, Adams Dep., Exhibit 4).  He had**

**difficulty going up two flights of stairs.  (*Id.*). The plaintiff's pulmonary arterial hypertension**

**is associated to HIV disease. *(Id.)*.  Dr. Vallerie McLauglin recommended intravenous Flolan**

**to treat his condition, which required medication, ambulatory infusion pump and a catheter.**

**(*Id*).**

   51.    Adams says his pulmonary hypertension caused him to have shortness of breath and

lose weight. (Ex. C, Adams Dep., 99:20-24). From 2000 until 2001, Adams wore under his clothes

a pulmonary pump that was the size of a cigarette pack to pump medication into his abdomen. (Ex.

C, Adams Dep., 100:8-101:16, 123:1-22). The pulmonary pump caused him pain and he lost

approximately twenty pounds during the year that he wore the pulmonary pump, but it did not affect

his ability to work. (Ex. C, Adams Dep., 101:5-24, 103:23-104:8, 125:21126:4).

**RESPONSE**:

   **Admit**.

52.     Before Obilor supervised Adams, Wells once saw Adams in pain and asked him how he was; Adams replied that he was fine and never told Wells that he had HIV. (Ex. C, Adams Dep., 126:19-127:13, 129:18-130:12, 132:6-22). Apart from when Adams told Wells about his pulmonary pump in 2001 and when Wells asked Adams if he was "okay" and Adams said yes, the two did not talk about Adams' health. (Ex. C, Adams Dep., 127:4-13, 132:6-22, 134:16-19).

**RESPONSE**:

   **Plaintiff admits to all of Def's SOF # 52 except plaintiff denies that Wells and plaintiff did not talk about Adams' health.  On a separate occasion Wells called plaintiff into his office and questioned plaintiff about his health.  (Plf's Ex. 5, Adams Dep., 132:6-15).**

53.     When Adams was hospitalized for three days, Betra Rodriguez Shaw ("Shaw"), the Administrative Services Officer in the DPD, visited Adams after he asked her to pick up medication from his house. (Ex. C, Adams Dep., 90:3-19; 122:11-15, 124:14-125:10, 247:13-19; Deposition of Betra Rodriguez Shaw ("Shaw Dep."), 10:12-19, 17:13-20:4,22:20-22, 28:2-7, attached as Ex. M). Adams did not tell her what the medication was for and did not tell her he has HIV. (Ex. C, Adams Dep., 247:13-19; Ex. M, Shaw Dep., 19:6-20:4, 22:20-22, 28:2-7). Shaw did not know what medical conditions Adams had, but did know that Adams was sick and had to wear a pump because Adams would complain about the device to Shaw. (Ex. M, Shaw's Dep., 20:18-22:22, 28:2-7).

**RESPONSE**:

   **Admit**.

54.     After Adams' hospitalization in 2001, he gave Beverly Giovenco ("Giovenco"), the DPD's Supervisor of Personnel, a one-page print-out describing pulmonary hypertension and the primary and secondary causes of it. (Ex. C, Adams Dep., 127: 4-130:15, 130:21-132:5, 239:10-14; see Adams' Deposition Ex. No. 6; Ex. H, Giovenco Dep., 9:4-15). Adams never told Giovenco that he had HIV and he is not sure that she read the print-out. (Ex. C, Adams Dep., 127:14-130:15, 130:21-132:5, 239:10-14).

**RESPONSE**:

**Admit.  According to the discharge summary from Rush-Presbytarian after his 2001 hospitalization, Adams was diagnosed with pulmonary hypertension and congestive heart failure.  (Plf's Ex. 5, Adams Dep., Exhibit 5).  Adams reported shortness of breath, fluid in his belly, a 20 pound weight loss over the past year, and diarrhea.  (*Id.).*  The attending physician noted that the patient was thin.  (*Id.*)**

55.     According to the print-out Adams gave Giovenco, the secondary causes of pulmonary hypertension include: emphysema and bronchitis and other less frequent causes such as scleroderma, CREST syndrome, systemic lupus erythematosus, congenital heart disease, chronic pulmonary thromboembolism, HIV infection, liver disease and some diet drugs. (Ex. C, Adams Dep., Adams' Deposition Ex. No. 6). After 2001, his pulmonary hypertension completely went away. (Ex. C, Adams Dep., 103:9-11, 103:23-104:13, 119:1-14).

**RESPONSE**:

**Plaintiff admits to all of Def's SOF # 53 except plaintiff denies that his pulmonary hypertension completely went away but admit that it became asymptomatic. (Plf's Ex. 5, Adams Dep. Ex. No. 6).**

32

56.     Adams did not discuss his health with Bravo. (Ex. C, Adams Dep., 134:13-15). When Adams coughed at work, Obilor told him to go home if he was sick. (Ex. C, Adams Dep., 133:5-134:12). Adams did not tell Obilor that he had HIV. (Ex. C, Adams Dep., 133:5-12, 145:3-7).

**RESPONSE**:

**Admit**.

57.     The people in the Fiscal Unit did not talk about Adams' health. (Ex. G, Mota Dep., 26:8-20; Ex. M, Shaw Dep., 28:5-7; Deposition of Jason Rivas ("Rivas Dep."), 35:23-36:5-7, 39:7-10, attached as Ex. 10).

**RESPONSE**:

**Deny, Betra Rodriguez-Shaw testified that everyone was talking about plaintiff's hospitalization and she noticed that he lost a considerable amount of weight. (Deposition of Betra Rodriguez-Shaw ("Shaw Dep."), 16:15-19,17:4-15, 18:3-12, 20:1-17, attached as Plf's Ex.10).**

58.     Adams lost twenty pounds of weight from July 2000 until July 2001. (Ex. C, Adams Dep., 124:14-126:4, 135:24-136:19). Weight loss does not mean someone has HIV. (Deposition of Dr. Todd Hargan ("Hargan Dep."), 6:24-8:20, attached as Ex. 0).

**RESPONSE**:

**Plaintiff moves to strike on grounds of relevancy.  Notwithstanding plaintiff admits that weight loss does not mean someone has HIV, and that weight loss is a symptom of HIV.  (Plf's Ex. 5, Adams Dep., Ex. 4 and 5.)**

59.     On July 21, 2005, while on administrative leave as his discharge was being considered, Adams gave Giovenco a note stating that he was receiving HIV treatment. (Ex. H,

Giovenco Dep., 16:11-19:20). Giovenco does not remember showing the note to anyone but Bravo. (Ex. H, Giovenco Dep., 16:11-19:20).

**RESPONSE**:

 **Admit**.

60. Apart from missing five days of work in 1999 for the shingles and the three days he was hospitalized in 2001, Adams did not miss any other work because of his HIV. (Ex. C, Adams Dep., 97:15-97:22,103:23-105:9, 125:3-10; Ex. M, Shaw Dep., 33:15-18, 35:4-10).

**RESPONSE:**

 **Admit**.

### V.  ADAMS' IDHR CHARGES

61. On December 15, 2004, while Adams was serving his twenty-nine day suspension, he filed Charge No. 2005 CF 1787 with the Illinois Department of Human Rights ("IDHR") ("2004 IDHR Charge"), alleging that the City had discriminated against him because it perceived he had HIV by wrongfully suspending him on August 19, 2004, October 1, 2004, and December 2, 2004. (Ex. C, Adams Dep., 147:12-150:13, 201:14-202:8; December 15, 2004 IDHR Charge No. 2005 CF 1787 ("2004 IDHR Charge"), attached as Ex. P).

**RESPONSE**:

 **Admit**.

62. The City received notice of Adams' December IDHR Charge in January 2005. (Defendant's Objections and Answers to Plaintiffs First Set of Interrogatories to Defendant, ¶15, attached as Ex. Q). On July 13, 2005, Adams, Bravo, Giovenco, and Obilor went to an IDHR fact-finding conference. (Ex. F, Obilor Dep., 201:5-202:23; City of Chicago's Answers and

Objections to Plaintiff's Second Set of Interrogatories, ¶ 1, attached as Ex. R). Bravo, Giovenco, Obilor, and Wells learned that Adams had HIV in or around July, 2005. (Ex. D, Wells Dep., 66:24-67:10; Ex. F, Obilor Dep., 201:5-202:23; Ex. H, Giovenco Dep., 16:11-19:13).

**RESPONSE**:

**Admit.  However, Obilor and Bravo suspected that plaintiff had HIV/AIDS sometime in December 2004 or before. (Plf's Ex. 11, Deposition of Jason Rivas ("Rivas Dep."), 12:4-20:25; Rivas' Deposition Ex. No. 1).**

63.     On August 8, 2005, after his termination, Adams filed his second charge, Charge No. 2006 CF 0292, with the IDHR ("2005 IDHR Charge"). (Ex. C, Adams Dep., 150:22-151:12; August 8, 2005 IDHR Charge No. 2006 CF 0292 ("2005 IDHR Charge"), attached as Ex. S). In it, Adams alleged retaliation for filing the 2004 IDHR Charge when he was placed on administrative leave on July 15, 2005 and then terminated on August 5, 2005. (Ex. C, Adams Dep., 150:22-152:7; Ex. S, 2005 IDHR Charge).

**RESPONSE**:

**Admit**.

64.     After Adams returned to work from his twenty-nine day suspension, Adams testified that an intern named Jason Rivas ("Rivas") told Adams of a "kind of not cool" conversation Rivas overheard. (Ex. C, Adams Dep., 135:4-21, 140:19-144:10). Adams did not include what Rivas overheard in any IDHR charge or amended charge. (*See* Ex. P, 2004 IDHR Charge; Ex. S, 2005 IDHR Charge).

**RESPONSE**:

**Admit.  However, the affidavit was submitted by fax to the IDHR by Jason Rivas. (Plf's**

35

**Ex. 12).**

65.     After receiving his Right-to-Sue letters, Adams filed a *pro se* complaint against the

City. *(See* Docket Entry 1; Ex. A, TAC, ¶¶ 9, 12; Ex. B, Ans. TAC, ¶¶ 9, 12).

**RESPONSE**:

    **Admit.**

    **VI.     WORK ENVIRONMENT**

66.     Mota was the only other Accountant IV in the Fiscal Unit while Adams was there.

(Ex. C, Adams Dep. 22:23-23:15). Adams did not know what work Mota did. (Ex. C, Adams Dep.

81:7-82:9).

**RESPONSE**:

    **Admit**.

67.     Obilor required the Fiscal Unit employees to complete work per his specifications.

(Ex. J, Drews Dep., 24:24-25:19). Mota, Tina Drews ("Drews"), and Linda Casper ("Casper") were

called into Obilor's office and Obilor told them that their work was not done the way that he wanted

and they had to re-do it his way. (Ex. J, Drews Dep., 24:24-25:19). Obilor would counsel the

employee as to what was done incorrectly. (Ex. F, Obilor Dep., 146:7147:24). If the counseling does

not work, then Obilor will issue discipline. (Ex. F, Obilor Dep., 146:7-147:24).

**RESPONSE**:

    **Plaintiff admits all of Def's SOF # 67 except plaintiff denies that he was ever**

**"counseled" by Obilor.  Plaintiff states that Obilor only issued discipline to him.**

68.     Obilor disciplined Adams, Casper, and James Varghese. (Ex. F, Obilor Dep.,

148:1-151:23; Ex. J, Drews Dep., 27:11-16). Casper, an Accounting Supervisor who handled

administrative bills, was given an oral reprimand and counseling for failing to establish a vendor code. (Ex. C, Adams Dep., 34:5-35:16, 80:8-24; Ex. F, Obilor Dep., 148:5-149:17). James Varghese, the Accountant IV that replaced Adams, was disciplined with a written reprimand for unprofessional conduct and poor conduct. (Ex. F, Obilor Dep., 39:4-40:2, 149:18-151:20).

**RESPONSE**:

    **Admit**.

69.    When Obilor began working with the DPD in August 2004, he instituted new policies that Adams believed were only directed towards him. (Ex. C, Adams Dep., 21:10-22:10, 69:7-70:18, 71:11-73:18; Ex. F, Obilor Dep., 52:2-53:14, 56:8-57:1, 59:11-60:13, 89:5-16, 144:23-145:2). One Obilor policy was the Accountant IV's not go to the Comptroller's office, which is in a separate building, to pick up the checks. (Ex. C, Adams Dep., 69:11-70:18, 71:19-73:8).

**RESPONSE**:

    **Admit**.

70.    Adams "guess[ed]" that Obilor had a special bathroom rule. (Ex. C, Adams Dep., 71:11-18, 78:3-79:8). Adams, who allegedly had to frequently use the bathroom, was supposed to tell Obilor every time he went to the restroom. (Ex. C, Adams Dep., 71:11-16, 78:3-79:8). Adams admits it was only a "guess" that this rule only applied to him. (Ex. C, Adams Dep., 71:11-18, 78:3-79:8).

**RESPONSE**:

    **Deny. Plaintiff states that the rule applied only to him. Obilor testified that restroom breaks were the exception to his "do not leave the office" rule. (Plf's Ex. 6, Obilor Dep., 104:18-105:12, 107:13-18.**

71.     Obilor's policies, including his central filing policy; processing a voucher in five-to-ten days; including the PIN number on all vouchers; asking Obilor's permission before working with an intern; and reviewing employees' e-mails before sending them out applied to the entire Fiscal Unit. (Ex. G, Mota Dep., 12:12-24, 13:1-17; Ex. F, Obilor Dep., 52:2-55:9, 89:5-16, 91:6-93:7, 144:23-145:5).

**RESPONSE**:

    **Admit.**

72.     The DPD had up to three interns at any given point that provided assistance, including interns Nikki Arrington and Jason Rivas. (Ex. C, Adams Dep., 92:2-5, 209:14-214:4; Ex. F, Obilor Dep., 166:16-167:6; Ex. N, Rivas Dep., 10:9-11:6). Arrington logged the processed vouchers into the central filing database. (Ex. C, Adams Dep., 209:14-214:4). Rivas provided general support and he did not have any knowledge as to how work was distributed. (Ex. N, Rivas Dep., 10:9-11:6, 29:14-21).

**RESPONSE**:

    **Plaintiff admits that DPD had three interns available for assistance. However, if a staff member needed such assistance, one had to go to Obilor to get his OK. (Plf's Ex. 4, Mota Dep., 13:1-11).**

73.     Rivas was employed in the DPD as an intern for a little over one month, from December 2004 until January 2005. (Ex. N, Rivas Dep., 8:3-14). Rivas did not enjoy the atmosphere because some City employees commented that they were unhappy. (Ex. N, Rivas Dep., 31:8-32:14). After a little over one month, Rivas resigned. (Ex. N, Rivas Dep., 8:3-14, 17:9-11).

**RESPONSE**:

**Plaintiff denies that Rivas was employed as an intern from December 2004 until January 2005. Rivas testified that he worked from December 2004 Through January 2005. *Id*. Plaintiff admits to the remainder of Def's SOF 73.**

74.     Rivas never worked with Adams in December 2004; Adams was off work then. (Ex. N, Rivas Dep., 17:15-20). They never discussed Adams' health and Rivas did not know his HIV or AIDS status. (Ex. N, Rivas Dep., 36:2-7). Rivas does not recall anyone at the City talking about Adams' health. (Ex. N, Rivas Dep., 27:13-15, 39:7-10). Rivas does not recall overhearing any derogatory comments about Adams. (Ex. N, Rivas Dep., 27:16-28:2).

**RESPONSE**:

**Deny. (Plf's Ex. 11, Rivas Dep., 12:4-20:25; Rivas' Deposition Ex. No. 1).**


By:    /s/ John S. Bishof, Jr.

Law Office of John Bishof P.C.
77 West Washington St., Suite 1910
Chicago, IL 60602
Ph: 312-630-2048
Fax: 312-630-2085
jsbishof@yahoo.com

39

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing **Plaintiff's Response to Defendant City's Local Rule 56.1(A)(3) Statement of Undisputed Facts** was served upon the following counsel via the Court's CM/ECF system on the 8th day of July 2009:

Attorneys for Defendant

Peter Ahmadian
pahmadian@cityofchicago.org

Alexandra Relias
alexandra.relias@cityofchicago.org

/s/ John S. Bishof, Jr.