1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4

5

    DAVID ADAMS,                )

6                       )

             PLAINTIFF,     )

7                       )

          v.            ) No. 07 C 3980

8                       )

    CITY OF CHICAGO,       )

9                       )

          DEFENDANTS.     )

10  _____)

11

12

13       Deposition of JASON C. RIVAS, taken on

14       behalf of Plaintiff, at 515 South

15       Flower Street, Los Angeles, California,

16       commencing at 5:08 p.m., Monday,

17       May 11, 2009, before WILLIE ANDERSON,

18       JR., CSR 13385.

19

20

21

22

23

24

25                         **Exhibit 2**

```
1     APPEARANCES OF COUNSEL:
2
3          FOR THE PLAINTIFF:
4               LAW OFFICE OF JOHN BISHOF, P.C.
                BY:  JOHN BISHOF, ESQ.
5               77 West Washington Street
                Suite 1910
6               Chicago, Illinois 60602
                (312) 630-2048
7          APPEARING TELEPHONICALLY
8          FOR THE DEFENDANTS CITY OF CHICAGO:
9               CITY OF CHICAGO DEPARTMENT OF LAW
                BY:  ALEXANDRA C. RELIAS, ESQ.
10              30 North LaSalle Street
                1020
11              Chicago, Illinois  60602
                (312) 744-6919
12              Alexandra.Relias@cityofchicago.org
13         FOR THE DEFENDANTS CITY OF CHICAGO:
14              CITY OF CHICAGO DEPARTMENT OF LAW
                BY:  PETER AHMADIAN, ESQ.
15              30 North LaSalle Street
                1020
16              Chicago, Illinois  60602
                (312) 744-6919
17              Alexandra.Relias@cityofchicago.org
                APPEARING TELEPHONICALLY
18
19
20
21
22
23
24
25
```

1                           I N D E X

2    DEPONENT:                    EXAMINED BY:         PAGE:

3    JASON C. RIVAS           MR. BISHOF               5

4                             MS. RELIAS               20

5

6

7

8    EXHIBITS FOR IDENTIFICATION:                      PAGE:

9    Plaintiff's:

10   1 - Affidavit by Jason C. Rivas                   11

11   2 - Letter of Resignation of Jason C. Rivas       20

12

13

14

15

16                    INFORMATION REQUESTED

17                         (None)

18

19           WITNESS INSTRUCTED NOT TO ANSWER

20                         (None)

21

22

23

24

25

| | |
|---|---|
| 1    Los Angeles, California; Monday | 1 answer, please state "Yes" or "No" because it's hard to |
| 2     May 11, 2009 | 2 transcribe "uh-uh" and "uh-huh." We all use those |
| 3      5:08 p.m. | 3 terms. Also, please wait until I finish the question |
| 4 | 4 before you start your answer, and I, hopefully, will |
| 5   DEPOSITION OFFICER: Do you solemnly swear | 5 provide the same courtesy to you that I won't start my |
| 6 that the testimony you are about to give in this matter | 6 next question before you give your answer. Okay? |
| 7 shall be the truth, the whole truth, and nothing but | 7  A Okay. |
| 8 the truth, so help you God? | 8  Q Last but most important, if there's a question |
| 9   THE WITNESS: I do. | 9 I ask that is not clear to you, please do not attempt |
| 10 | 10 to answer the question, and tell me you do not |
| 11    JASON C. RIVAS, | 11 understand the question, and I will rephrase it or pass |
| 12   witness, was sworn and examined | 12 it. Okay? |
| 13    and testified as follows: | 13  A Okay. Yes. |
| 14 | 14  Q For the record, would you give us your date |
| 15    EXAMINATION | 15 and place of birth? |
| 16   MR. BISHOF: For the record, who's present in | 16  A Yes. Date and place would be San Antonio, |
| 17 the room? | 17 Texas, and it's 1/24/76. |
| 18   MS. RELIAS: Alexandra Relias for the City of | 18  Q And the highest level of education you've |
| 19 Chicago. | 19 completed? |
| 20   THE WITNESS: Jason Rivas. | 20  A MBA. |
| 21   MR. BISHOF: And at this end in Chicago at | 21  Q From what institution? |
| 22 77th West Washington, Room 1910 is: | 22  A Roosevelt University in Chicago. |
| 23   MR. AHMADIAN: Peter Ahmadian for the City of | 23  Q What year did you receive your MBA? |
| 24 Chicago, A-h-m-a-d-i-a-n. | 24  A 2005. |
| 25   MR. BISHOF: And John Bishof representing | 25  Q And what was the -- your concentrated study |
| Page 5 | Page 7 |

| | |
|---|---|
| 1 David Adams. | 1 for your MBA? |
| 2   And the witnesses has been sworn in. | 2  A Real estate. |
| 3   THE DEPOSITION OFFICER: Yes. | 3  Q Could you briefly give us a work history while |
| 4   MR. BISHOF: Okay. Let the record show that | 4 you were here in Illinois? |
| 5 this is the deposition of Jason Rivas, a witness in the | 5  A Certainly. Let me just think back about it a |
| 6 case that is now pending in the United States District | 6 little bit. I worked with the Institute of Real Estate |
| 7 Court for the Northern District of Illinois Eastern | 7 Management from February of 2004 through August of |
| 8 Division. | 8 2004, and then again in February of 2005 through August |
| 9   Caption David Adams versus City of Chicago, | 9 of 2005. |
| 10 docket number 07C3980. Let the record further show | 10   There was a time where I was with the City of |
| 11 that this deposition is given pursuant to subpoena and | 11 Chicago as an intern, the, I believe, the urban and |
| 12 Notice and by agreement of the deponent continued to | 12 planning development. I don't recall the exact |
| 13 this date and time. | 13 timeframe, but I believe it was December of '04 through |
| 14 BY MR. BISHOF: | 14 January of '05. |
| 15  Q Mr. Rivas, have you ever given a deposition | 15  Q When did you leave the Chicago area? |
| 16 before? | 16  A I left the Chicago area in December of '05. |
| 17  A No, I have not. | 17  Q And you currently reside in California? |
| 18  Q Okay. There's a few ground rules, and I'll go | 18  A Yes, I do. |
| 19 through them with you. First, obviously, when the | 19  Q And what is your current employment? |
| 20 deponent is not in the same room as the person who's | 20  A As property assistant with the Commercial |
| 21 interrogating the deponent, you have to make all your | 21 Property Company. |
| 22 responses verbally. | 22  Q And how long have you been with this real |
| 23   The court reporter cannot take down a nod of | 23 estate company? |
| 24 the head, a shrug of the shoulder, or hand gesture. | 24  A About one year. |
| 25 Also if I ask a question that deserves a "Yes" or "No" | 25  Q Directing your attention to back when you were |
| Page 6 | Page 8 |

### Page 9

1  working for the City of Chicago.
2       What was your first position with the City of
3  Chicago?
4       A  It was an intern.  I don't recall the exact
5  title, but it was an intern with the urban and planning
6  development.
7       Q  Who was your direct supervisor?
8       A  Actually, I do not recall.  Actually, I do not
9  recall.
10      Q  When you say that you were "an intern," what's
11  the difference between being an intern and an employee
12  with the City of Chicago, if you know?
13          MS. RELIAS:  Object to the form.  You can
14  answer.
15          THE WITNESS:  I can answer?  Okay.  Well, from
16  my understanding it's -- an intern is not a contract of
17  employment.  It's more of just an experience with a
18  lower pay scale.  In this case through the City of
19  Chicago.
20  BY MR. BISHOF:
21      Q  Were you a student at the time that you
22  became -- began your your term as an intern?
23      A  Yes, I was.
24      Q  And was that when you were at Roosevelt?
25      A  Yes.

Page 9

### Page 10

1       Q  What were your hours if you recall back in
2  December of '04?
3       A  You know, actually, I don't recall the
4  specific hours.
5       Q  Did you work a 40-hour week?
6       A  No.  I did not.
7       Q  Was it more than twenty?
8       A  I don't recall.
9       Q  What were your job duties as an intern for the
10  City of Chicago?
11      A  The job duties varied, but it was basically
12  just providing support to the department that I was
13  working for, again, the Urban and Planning Development
14  Department.  The tasks, basically, changed from
15  day-to-day situation.  It was never anything
16  specifically that I was responsible for.
17      Q  What was your understanding of the
18  responsibilities of the department that you were
19  assigned to?
20          MS. RELIAS:  Objection.  Form.
21          THE WITNESS:  Can you repeat that, please.
22          MR. BISHOF:  Mr. Court Reporter, will you
23  please repeat the question for me or read the question.
24          (The record was read by the Court Reporter
25          as follows:

Page 10

### Page 11

1       "Q.  What was your understanding of
2       the responsibilities of the
3       department that you were assigned to?")
4          THE WITNESS:  Okay.  Again, my understanding
5  is just to provide support to the department that I was
6  working for.
7  BY MR. BISHOF:
8       Q  Do you recall any of the individuals that
9  worked in that department?
10      A  No, not specifically.
11      Q  Do you recall a David Adams?
12      A  Yes, I do.
13      Q  What was his position?
14      A  I don't actually know his title or didn't know
15  his title.
16      Q  Did you provide him any assistance?
17      A  I don't recall providing assistance, no.
18      Q  Do you recall any of the names of the people
19  you did provide assistance?
20      A  No, not -- not anymore.
21          MR. BISHOF:  Let's mark the affidavit as
22  Exhibit 1, please.
23          (Plaintiff's Exhibit 1 was marked for
24          identification by the Court Reporter,
25          and a copy is attached hereto.)

Page 11

### Page 12

1          MR. BISHOF:  Would you please hand that over
2  to Mr. Rivas.
3  BY MR. BISHOF:
4       Q  Mr. Rivas, you've been handed what has been
5  previously marked as Exhibit No. 1 and asked if you can
6  identify that exhibit.
7       A  Yes.  I have it right in front, the exhibit.
8       Q  And at the bottom left-hand corner, is that
9  your signature?
10      A  Yes, it is.
11      Q  And did you personally have that document
12  notarized?
13      A  Yes.
14      Q  Who drafted this document?
15      A  I did -- I did, actually.
16      Q  Let's go -- go through the document, and do
17  you take exception to any of the entries on this
18  affidavit?
19          MS. RELIAS:  Object.  Form.
20          THE WITNESS:  Actually, I don't understand
21  your question, specifically.
22  BY MR. BISHOF:
23      Q  Looking back at this document, there are
24  statements made; correct?
25      A  Yes.

Page 12

5  (Pages 9 to 12)

**Page 13**

1    Q   Are any -- as you look at this document, are
2  any of the -- any of the statements incorrect as you
3  sit here today?
4        MS. RELIAS:  Objection.  Form.
5        THE WITNESS:  I, actually -- again, this
6  was -- looks like it's some time ago; so I don't really
7  recall much of this incident or what I've placed here.
8  BY MR. BISHOF:
9    Q   But this is a document you drafted; correct?
10   A   Yes.
11   Q   You know the time -- the date and time that
12 you drafted this document?
13   A   No, I don't recall.
14   Q   Let's go through each paragraph and ask if you
15 recall anything else that is referred to in each of the
16 paragraphs.
17       In the first paragraph it says that you were
18 employed by the Department of Planning and Development
19 Administration Department.  You just testified that you
20 were assigned to the Urban Planning Department.
21       Is there something that you recall today that
22 changed your answer of where you were employed with the
23 City of Chicago?
24   A   No.  I think it's just the amount of time
25 that's elapsed.  I vaguely can recall any of the

**Page 14**

1  details regarding this.
2    Q   So you don't take exception to the fact that
3  you claim that you worked for the Department of
4  Planning and Development in this affidavit?
5        MS. RELIAS:  Objection.  Form.
6        THE WITNESS:  Well, I guess I would take
7  exception.  As I said earlier, the Department of
8  Urban -- Planning and Urban Development -- again, I
9  don't recall, specifically, the department or much
10 about this -- the history of my time there.
11 BY MR. BISHOF:
12   Q   Do you recall hearing -- overhearing a
13 conversation on January 7th, 2005?
14   A   I don't recall offhand, today, the
15 conversation.
16   Q   In drafting this affidavit, did you have any
17 assistance from anyone?
18   A   No, I did not.
19   Q   Do you recall Nikki Bravo or Leonard Obilor?
20   A   I recall -- the names look -- reading them
21 now, look familiar.  I do not recall their roles
22 with -- with the City.
23   Q   Do you recall where you were stationed when
24 you worked for this department?
25       MS. RELIAS:  Objection.  Form.

**Page 15**

1        THE WITNESS:  Yes, vaguely.
2  BY MR. BISHOF:
3    Q   How would you describe the station where you
4  were assigned?
5    A   It was a cubicle located near the rear of the
6  suite.
7    Q   Do you recall an empty cubicle that was in
8  front of you that was filled with boxes?
9    A   No, I don't recall any of the surrounding
10 environment.
11   Q   What do you recall about Mr. Adams as far as
12 how he was treated in the work environment?
13       MS. RELIAS:  Objection.  Form.
14       THE WITNESS:  The only thing I can recall at
15 this point is it was very little communication between
16 David and the rest of the department, actually.  I
17 don't recall much conversation.
18 BY MR. BISHOF:
19   Q   Looking at the third paragraph in quotes
20 between allegedly a conversation between Nikki Bravo
21 and Leonard Obilor.  You don't recall any -- witnessing
22 any conversation at all between those two?
23       MS. RELIAS:  Objection.  Form.
24       THE WITNESS:  No, I don't.
25 ///

**Page 16**

1  BY MR. BISHOF:
2    Q   Do you recall any -- anything regarding
3  Mr. Adams and his health?
4        MS. RELIAS:  Objection.  Form.
5        THE WITNESS:  No, I don't recall anything.
6  BY MR. BISHOF:
7    Q   Do you recall either Mr. Obilor or Ms. Bravo
8  instructing you not to give Mr. Adams any assistance?
9    A   No, I do not.
10   Q   Do you recall observing Mr. Adams having a
11 disproportionate amount of work compared to the other
12 employees?
13   A   I do recall that Mr. Adams had a large amount
14 of work.
15   Q   Do you recall what you meant by placing this
16 in this affidavit?  "I felt bad and could not stand to
17 work under these unfair conditions"?
18       MS. RELIAS:  Objection.  Form.
19       THE WITNESS:  Can you repeat that, Mr. Bishof?
20 BY MR. BISHOF:
21   Q   Sure.  Do you recall making the statement that
22 "I felt bad and could not stand to work under these
23 unfair conditions"?
24       MS. RELIAS:  Objection.  Form.
25       THE WITNESS:  I don't recall.

BY MR. BISHOF:

Q   Do you recall giving your resignation to both Nikki Bravo and Leonard Obilor?

MS. RELIAS: Objection. Form.

THE WITNESS: You know, I do not recall, specifically, providing my resignation to specific individuals.

BY MR. BISHOF:

Q   Do you recall the reasons why you resigned from the City of Chicago?

A   No, I don't.

Q   Were you still attending school at the time that you resigned from the City of Chicago?

A   Yes, I was.

Q   When you first was [Sic] employed by the City of Chicago was Mr. Adams in the office?

A   No, he was not.

Q   Did he come back to work at sometime subsequent to your hiring by the City of Chicago?

A   Yes, he did.

Q   And what, if anything, did you notice of his treatment by Nikki Bravo and Leonard Obilor?

MS. RELIAS: Objection. Form. Asked and answered.

THE WITNESS: Do I need to answer that too?

Page 17

MS. RELIAS: Yes. Answer that.

THE WITNESS: Okay. Again, it -- there seemed to be a lack of communication between David Adams and the rest of the department.

BY MR. BISHOF:

Q   Well, the fifth paragraph where you wrote "I eventually resigned. I could not take the treatment David Adams was receiving from Nikki Bravo and Leonard Obilor especially since I realized that he was a nice guy and taught me a lot."

Do you recall that paragraph?

MS. RELIAS: Objection. Form.

THE WITNESS: Vaguely, sir.

BY MR. BISHOF:

Q   Do you recall that you had the impression that Mr. Adams was a nice guy?

A   Yes.

Q   And it says here "and taught me a lot."

Do you recall him teaching you anything?

A   Yes. I do recall learning from him, again, the little time that I was there.

Q   And do you recall the treatment that Mr. Adams was receiving from Nikki Bravo and Leonard Obilor looking at this exhibit?

MS. RELIAS: Objection. Form. Asked and

Page 18

answered. This is the third time that you've asked that question. I believe that the witness has testified to his knowledge regarding that question.

THE WITNESS: No, not specifically.

BY MR. BISHOF:

Q   Well, how did you find out that he was fired?

A   I actually spoke with Mr. Adams at some point after his termination.

Q   All right. And in the second to the last paragraph it says "I know exactly why, and I offered my assistance."

What were the reasons that you knew or reason that you knew he was fired?

MS. RELIAS: Objection. Form. Foundation.

THE WITNESS: I do not recall.

BY MR. BISHOF:

Q   And what assistance, if you recall, did you offer Mr. Adams?

A   I don't recall, specifically.

Q   The last paragraph it says "This information that I'm offering is true and to the best of my knowledge. I hope it is helpful."

Do you have any reason to believe that the information that you offered in this affidavit was not true?

Page 19

MS. RELIAS: Objection. Form.

THE WITNESS: I don't have any reason to believe that what I wrote was untrue or not true. However, I don't recall much of the situation or what, you know, what I've previously written.

BY MR. BISHOF:

Q   Would it be a fair statement that you knew a heck of a lot more back then when you drafted this affidavit than you -- than you know now?

MS. RELIAS: Objection. Form.

THE WITNESS: Well, I think with the timeframe, I think I would probably recall more details at, you know, at that time, but much time has elapsed at this point.

BY MR. BISHOF:

Q   Do you have any knowledge or any reason to believe that any of these paragraphs were incorrect?

MS. RELIAS: Objection. Form. Foundation.

THE WITNESS: No, I do not, but, again, I don't recall much of what I've written previously.

MR. BISHOF: I have nothing further.

EXAMINATION

BY MS. RELIAS:

Q   Mr. Rivas, as you sit here today, do you have

Page 20

7  (Pages 17 to 20)

1   any independent recollection of the alleged
2   conversation between Nikki Bravo and Leonard Obilor
3   which is referred to in your affidavit?
4       A   No, I do not recall at this time.
5       Q   Do you -- so you have no recollection
6   whatsoever of the conversation referred to in here?
7       A   No, at this point I do not.
8       Q   Okay. Do you remember the names of any other
9   of the employees that you worked with at the City
10  besides David Adams and Nikki Bravo and David Obilor?
11      A   No, not at all.
12      Q   And you don't recall what your working hours
13  were when you were at the City?
14      A   No, I do not.
15      Q   Do you recall how many days you worked in the
16  same office with David Adams?
17      A   No. No.
18      Q   But you did state that you began working with
19  him -- you began working at the City when Mr. Adams was
20  not in the office?
21      A   That's correct.
22      Q   And then at some point he did come back?
23      A   Yes.
24      Q   And did you work with him at some point once
25  he returned to the office?

                                              Page 21

1       A   I did work with him very little. Yeah.
2       Q   Do you have any recollection of any projects
3   that you worked on with him?
4       A   No, none specifically at this time.
5       Q   Do you have any recollection of, you know, any
6   projects that you worked with -- you worked with
7   anybody at the City?
8       A   No, I can't remember the details.
9       Q   You stated that you talked to Mr. Adams after
10  he was terminated.
11          When was that?
12      A   I don't recall the specific date or time, but
13  I would imagine, maybe, a month to two after his
14  termination.
15      Q   And were you still in Chicago at that time?
16      A   Yes, I was.
17      Q   Was this a phone conversation or an in-person
18  conversation?
19      A   A phone conversation.
20      Q   Do you recall what he said to you and what you
21  said to him?
22      A   No, not at this time.
23      Q   But you did learn that he had -- was
24  terminated from the City?
25      A   Yes.

                                              Page 22

1       Q   Did you speak with him again after that
2   conversation?
3       A   Yes, I did.
4       Q   When was that conversation?
5       A   I would imagine -- again, I don't recall
6   specifically, but I would imagine, probably, within a
7   week after that conversation.
8       Q   And what did he say to you at that time, and
9   what did you say to him that you can recall?
10      A   I don't recall any specific details other
11  than, you know, just general encouragement about, you
12  know, finding a different employment opportunity.
13      Q   Were you -- did you consider him a personal
14  friend?
15      A   Yes.
16      Q   Did you go out socially?
17      A   No. No.
18      Q   Did you have his e-mail address or telephone
19  number?
20      A   Telephone number.
21      Q   And did you speak with him again after the
22  second conversation?
23      A   Yes.
24      Q   And when was that conversation?
25      A   I don't recall specifically.

                                              Page 23

1       Q   Do you recall what the conversation entailed?
2       A   I think just generally casual conversation.
3       Q   Did Mr. Adams ever discuss suing the City of
4   Chicago with you?
5       A   He just -- I believe he discussed the
6   potential of maybe taking legal actions against the
7   City at one point.
8       Q   And did he state why he thought he wanted to
9   take legal action against the City?
10      A   He stated that he felt that he wasn't treated
11  fairly there.
12      Q   Did he state anything else regarding that?
13      A   Not that I can recall specifically.
14      Q   Did he tell you why he felt he was treated
15  unfairly?
16      A   I'm just trying to recall the timeframe, but I
17  can't recall anything, specifically, that, you know,
18  for his reason of doing so other than him not being
19  treated fairly in his opinion.
20      Q   And did you speak with him again after this
21  third conversation?
22      A   Yes.
23      Q   And when was that, if you can recall?
24      A   I don't recall specifically. There would be a
25  handful of conversations between -- again, you know, a

                                              Page 24

                                    8 (Pages 21 to 24)

1 week -- within a week after his termination until maybe
2 the early part of 2006.
3    Q  And you said that you moved to California in
4 December of 2005?
5    A  Yes.
6    Q  Did you provide Mr. Adams your contact
7 information in California once you moved?
8    A  Well, I had maintained my Illinois, Chicago
9 phone number for sometime.
10    Q  And Mr. Adams contacted you once you moved to
11 California?
12    A  Yes.  We -- we spoke at a point when I was in
13 California.
14    Q  And what did the conversation entail?
15    A  I don't recall.
16    Q  Do you recall him asking you to draft up an
17 affidavit?
18    A  No, not specifically.  I recall -- you know,
19 just talking a little bit about the situation, but I
20 don't recall him asking me to draft up an affidavit.
21    Q  Do you recall why you drafted this document
22 which has been marked Exhibit 1?
23    A  No, I do not.
24    Q  Do you recall if you actually typed up the
25 document?

Page 25

1    A  Yes, I do.
2    Q  Do you recall speaking with Adams about typing
3 up this article -- this document?
4    A  Not specifically.
5    Q  Do you know how -- let's backtrack.  If we
6 look at Exhibit 1, you see that there is a charge
7 number listed.
8    A  Yes.
9    Q  And it says Illinois Department of Human
10 Rights.
11      Do you recall how you found out that
12 information regarding the charge number?
13    A  I don't recall, but just looking at it it
14 would have had to be obtained during the conversation
15 with Mr. Adams.
16    Q  Okay.  And do you recall if Mr. Adams asked
17 you to notarize the affidavit?
18    A  I don't know.  No, I don't believe so.
19    Q  And did you -- when it states up here there's
20 a fax number, do you recall who -- if you faxed this
21 document or who you faxed it to?
22    A  No, I do not.
23    Q  Okay.  Do you recall speaking with anyone at
24 the Illinois Department of Human Rights regarding this
25 matter?

Page 26

1    A  No.
2    Q  And is the only person you spoke to regarding
3 this was Mr. Adams?
4    A  Mr. Adams.  That's correct.
5    Q  And as you sit here today, do you recall
6 anything -- an independent recollection of anything,
7 any of these statements that are in the affidavit
8 regarding the conversation that you -- that is in the
9 affidavit that you allegedly overheard in January of
10 '05?
11    A  No.  At this point in time, I don't recall
12 anything specific to the affidavit.
13    Q  Do you recall anybody at the City of Chicago
14 speaking about Mr. Adams's health or medical condition?
15    A  I don't recall.
16    Q  Do you recall overhearing any derogatory
17 comments from any employees at the City about
18 Mr. Adams?
19    A  No, not specifically.
20    Q  Do you recall anything generally?
21    A  I do recall some, you know, negative, I guess,
22 conversations or -- but, you know, I didn't really --
23 basically, I just didn't pay attention much to it, so.
24    Q  Okay.  So those negative conversations -- do
25 you recall who was making them?  Who was engaged in the

Page 27

1 conversation?  And who they were about?
2    A  No.  Not specifically, no.
3    Q  And do you recall what position David Adams
4 held at the City?
5    A  No, I do not.
6    Q  Do you recall what type of work he did?
7    A  No, not specifically.
8    Q  And you don't recall any other employees that
9 worked at the City?
10    A  No.
11    Q  Or what type of work they might have done?
12    A  No.
13    Q  And you testified that your job duties were
14 basically to provide assistance to people in the
15 department; correct?
16    A  That's correct.
17    Q  But you can't recall with any specific
18 recollection what the duties were?
19    A  No, not at this time.  Just because it was
20 such a long time ago and for such a short duration.
21    Q  Did you ever work closely with Nikki Bravo or
22 Leonard Obilor that you can recall?
23    A  I don't recall.
24    Q  And you don't recall who your direct
25 supervisor was?

Page 28

9 (Pages 25 to 28)

1     A    No.
2     Q    Now, you stated that you believe that David
3  Adams had a lot of work?
4     A    (Nods.)
5     Q    What is that based on?
6     A    Basically, physically seeing a large quantity
7  or volume of work on his desk as opposed to the other
8  desks or employees desks that I saw.
9     Q    And when you say "a large amount of work" are
10  you referring to paperwork?
11     A    Yes.
12     Q    Stacks of paper?
13     A    Yes.  Paperwork and files.
14     Q    Were you -- did you have any knowledge of how
15  work was distributed among the employees at the City of
16  Chicago?
17     A    No.
18     Q    And do you have any recollection of any other
19  City employees that work in that department and what
20  work they had?
21     A    No.
22     Q    Whether it was large or small?
23     A    No.  Just that there -- the volume of work,
24  you know, just based on what I could see physically,
25  seemed lesser than what Mr. Adams had, and I didn't

Page 29

1  know specifically what projects or work was being done
2  by these individuals simultaneously.
3     Q    You just recall seeing a larger amount of
4  paperwork on David Adams's desk as compared to other
5  employees?
6     A    That's correct.
7     Q    Okay.  Do you know why David Adams was
8  terminated?
9     A    No, I do not.
10     Q    And you stated that when you first started at
11  the City David Adams was not working in the office.
12        Do you --
13        MR. BISHOF:  Objection.  Asked five times
14  already.
15  BY MS. RELIAS:
16     Q    Do you know why he was not working at the time
17  you started at the City?
18     A    No, I do not.
19     Q    Did you ever review Adams's work at the City
20  of Chicago?
21     A    No.
22     Q    Did you ever rate Adams's job performance?
23     A    No.
24     Q    Did you have any knowledge of any disciplinary
25  actions that might have been taken against him?

Page 30

1     A    No.
2     Q    Do you have any common friends with Adams?
3     A    No.
4     Q    And did you speak with any other employees
5  after you left the City of Chicago that you can recall
6  besides Adams?
7     A    No, I do not.
8     Q    Now, with regard to your job at the City of
9  Chicago, did you -- did you enjoy working there?
10     A    I'd say based -- overall my experience was not
11  a positive one.
12     Q    Why would you say that?
13     A    I don't know.  It just appeared that -- I
14  don't know.  It just seemed like it had a negative
15  atmosphere to it.
16     Q    What was negative about it that you can
17  recall?
18     A    A lot of the department employees from what I
19  recall, some of the comments they made, implied that
20  they were unhappy which basically filtered down to
21  others that worked for them.
22     Q    Did David Adams discuss being unhappy working
23  there?
24     A    No.
25     Q    These were just comments from other employees

Page 31

1  besides Adams?
2     A    Just generally speaking, but I can't recall
3  David Adams specifically stating anything.
4     Q    Did you feel that your work at the City was
5  challenging?
6     A    No.
7     Q    Did you want more substantive work?
8     A    Yes, I did.
9     Q    Is that a reason why you resigned?
10     A    It was one of the reasons, yes.
11     Q    What were the other reasons?
12     A    I was just looking for, I guess, predominantly
13  I was looking for an opportunity where I could learn.
14  Again, it was a negative atmosphere.
15     Q    Did you get along with the other coworkers
16  there besides Adams?
17     A    Generally speaking, yes.
18     Q    And do you recall how you got along with Nikki
19  Bravo or Leonard Obilor?
20     A    No, not specifically.
21        MS. RELIAS:  Like to mark this as Exhibit 2.
22        And this is the letter of resignation from
23  Jason Rivas dated January 18, '05.
24        (Plaintiff's Exhibit 2 was marked for
25  identification by the Court Reporter,

Page 32

10  (Pages 29 to 32)

1     and a copy is attached hereto.)
2  BY MS. RELIAS:
3     Q   If you could look at this document, and let me
4  know if that's familiar to you?
5     A   Okay.
6     Q   And is this document familiar to you?
7     A   Vaguely.
8     Q   Do you recall this as being your letter of
9  resignation dated January 18, '05?
10    A   I do, vaguely.
11    Q   Do you have an independent recollection of
12 typing up this letter?
13    A   Yes.
14    Q   Now, when you state here in the first
15 paragraph that you were disappointed with your tenure
16 at the Fiscal Department of the City of Chicago.
17       Can you explain a bit more why you were
18 disappointed?
19    A   Again, you know, I was looking for more of a
20 learning opportunity, and I was disappointed with the
21 atmosphere as it, again, was a negative one in my
22 opinion.
23    Q   And when you refer to a hostile environment in
24 that same paragraph, are you referring to that negative
25 atmosphere that you've already testified to?

Page 33

1     A   Yes.
2     Q   And do you recall any employees at the City
3  being specifically hostile or were you just referring
4  to the negative atmosphere?
5     A   Well, again, I vaguely can recall, but I do
6  remember that there were some hostile, if you want to
7  call them, arguments amongst employees.
8     Q   Do you recall who had those arguments?
9     A   No, not specifically.
10    Q   Do you recall what those arguments were about?
11    A   No.
12    Q   You also state in the first paragraph that
13 there was a lack of respect and failure to assume
14 responsibility and lack of communication when it comes
15 to accomplishing an assignment or task.
16       Do you -- do you respond -- excuse me.
17       Do you recall specific people being
18 disrespectful to you at the office?
19    A   No, not specifically.  No one specifically.
20    Q   Do you recall specific individuals being
21 disrespectful to others in the office?
22    A   Generally speaking I do, but I don't recall
23 the individuals or their names back during that time.
24    Q   And what do you mean when you state that there
25 was a failure to assume responsibility and lack of

Page 34

1  communication when it comes to accomplishing an
2  assignment or task, if you can recall?
3     A   Well, from what I can recall, I think just
4  generally speaking, I think there was a lot of
5  finger-pointing within the department.
6     Q   Do you recall any specific employees that
7  engaged in the finger-pointing?
8     A   No one specific, no.
9     Q   And as you sit here today, do you have a
10 personal opinion about Leonard Obilor?
11    A   No, I do not.
12    Q   And as you sit here today, do you have any
13 personal opinions regarding Nikki Bravo?
14    A   No, I do not.
15       MS. RELIAS:  You know, can I just take a quick
16 break, John.
17       MR. BISHOF:  Sure.
18       MS. RELIAS:  All right.  Thank you.
19       (A brief recess was taken.)
20 BY MS. RELIAS:
21    Q   Mr. Rivas, do you know who David Wells is?
22    A   Okay.
23    Q   Okay.  And do you recall hearing any
24 conversations at the City of Chicago regarding David
25 Adams having HIV or AIDS?

Page 35

1     A   No, I don't.
2     Q   Do you have any knowledge of whether he has
3  HIV or AIDS?
4     A   No, I don't.
5     Q   Did he ever discuss any medical conditions
6  with you?
7     A   No.
8     Q   And do you recall having any conversations
9  with other employees regarding David Adams, in general,
10 while working at the City?
11    A   No.
12    Q   And you said that Adams did teach you some
13 things.
14       Can you elaborate on what those were?
15    A   No, I can't.  I don't recall the specific
16 details at this time.  I just recall having learned
17 more from Mr. Adams as opposed to the timeframe prior
18 to his arrival back in the department.
19    Q   And do you recall how many days that you
20 worked with Adams?
21    A   No.
22    Q   But you believe it was a short timeframe?
23    A   Yes.  Overall it was a short timeframe.
24    Q   And you do recall that you thought he was a
25 nice guy?

Page 36

11  (Pages 33 to 36)

1    A  Yes.
2    Q  Okay.  When did you first speak with
3  Mr. Bishof or Ms. Gerverich?
4    A  First spoke with -- with this office
5  approximately about two weeks -- one and a half to two
6  weeks ago.
7    Q  And did you speak with them over the telephone
8  or via e-mail?
9    A  Both.  Predominantly via e-mail.
10   Q  And what were those conversations regarding?
11   A  Basically regarding the deposition.
12   Q  Did you speak with them about your testimony
13  here today?
14   A  No.
15   Q  Okay.  Would you say that you mostly spoke
16  with them regarding scheduling?
17   A  Yes.  Exactly.
18   Q  Did you tell them that you didn't recall many
19  of the instances regarding your timeframe at the City?
20   A  Via e-mail I stated that I vaguely remembered
21  or recalled the situation.
22   Q  Were you reluctant to sit for this deposition?
23   A  No.  Well, I was reluctant to sit for the
24  deposition during work hours.  Just, you know, for job
25  stability reasons.

                                        Page 37

1  just speaking about possibly filing a lawsuit?
2    A  No, not specifically.
3    Q  So we've exhausted your memory regarding any
4  conversations at the City of Chicago that you can
5  recall today regarding David Adams?
6    A  Yes, that's correct.
7    Q  And you never -- as you sit here today, you
8  don't recall anyone at the City of Chicago discussing
9  David Adams having AIDS or being HIV positive?
10   A  No, I don't recall at this time.
11       MS. RELIAS:  All right.  I have no further
12  questions.
13       MR. BISHOF:  All right.  Signature?
14  Mr. Rivas?  No.  No.  This is a -- never mind.
15  Different venue.  There's no waiver of signature.  I
16  mean there is no reserve for waiver in federal court.
17  Thank you, Mr. Rivas.
18       THE WITNESS:  Thank you.
19       MS. RELIAS:  Thank you.
20       We would like a copy of this expedited.
21       MR. BISHOF:  I'll need a copy.
22       (Whereupon, the proceedings recessed at
23       the hour of 6:01 p.m.)
24
25

                                        Page 39

1    Q  And did you review any documents prior to your
2  deposition today?
3    A  No.
4    Q  Did plaintiff's counsel send you a copy of
5  your affidavit that you signed in 2006?
6    A  Yes, they did.
7    Q  And did you review that affidavit?
8    A  No.  I merely just opened the document and
9  then closed it because it was during business hours so
10  I never got a chance to get back to reviewing.
11   Q  So the first time you actually read the
12  document since you drafted it was today?
13   A  That's correct.
14   Q  And did you talk to David Adams prior to this
15  deposition?
16   A  No.
17   Q  And when was the last time that you spoke with
18  him that you can recall?
19   A  That I can recall at some point in the early
20  maybe midpoint of 2006.
21   Q  And do you recall what that conversation was
22  about?
23   A  No, I do not.
24   Q  And do you recall David Adams ever discussing
25  with you his filed lawsuit against the City besides

                                        Page 38

1  STATE OF CALIFORNIA          )
2  COUNTY OF LOS ANGELES        ) ss.
3
4
5
6
7
8
9
10      I, JASON C. RIVAS, say I have read the
11  foregoing deposition and declare under penalty of
12  perjury that the foregoing is true and correct; that I
13  have made any corrections as appear noted, in ink,
14  initialed by me.
15      EXECUTED this _____ day of _____,
16  20____, at _____, _____.
            (City)        (State)
17
18
19      _____
            JASON C. RIVAS
20
21
22
23
24
25

                                        Page 40

```
 1              REPORTER'S CERTIFICATE
 2
 3         I, WILLIE ANDERSON, JR., a Certified Shorthand
 4    Reporter of the State of California, No. 13385, do
 5    hereby certify:
 6         That the foregoing proceedings were taken
 7    before me at the time and place herein set forth; that
 8    any witnesses in the foregoing proceedings, prior to
 9    testifying, were placed under oath; that a verbatim
10    record of the proceedings was made by me using machine
11    shorthand which was thereafter transcribed under my
12    direction; further, that the foregoing is an accurate
13    transcription thereof.
14         That the dismantling of the original
15    transcript will void the reporter's certificate.
16         I further certify that I am neither
17    financially interested in the action nor a relative or
18    employee of any attorney of any of the parties.
19         IN WITNESS WHEREOF, I have this date
20    subscribed my name.
21    Dated: _____
22
23
24         _____
              WILLIE ANDERSON, JR.
25            CSR No. 13385
                              Page 41
```