**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 3980 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

David Adams was employed by the City of Chicago as an accountant from 1999 until his termination in 2005. In this lawsuit, Adams contends he was subjected to a hostile work environment, disciplined, and ultimately discharged because he is infected with HIV. In the alternative, Plaintiff asserts that his discharge was in retaliation for his filing a charge of disability discrimination with the Illinois Department of Human Rights ("IDHR"). Defendant City of Chicago has moved for summary judgment, arguing that Plaintiff has no evidence of a hostile environment and that there was no impropriety in the decision to discharge him. The City contends that Plaintiff's medical condition does not qualify as a disability within the meaning of the Americans with Disabilities Act. In any event, the City urges, the decision-makers who disciplined Plaintiff over the several years of his employment were unaware of Plaintiff's HIV-positive status, and the discharge decision was based on Plaintiff's work performance and attitude. For the reasons set forth here, the motion is granted.

<u>**FACTS**</u>[1]

**Plaintiff's Assignment in the Fiscal Unit**

Plaintiff was employed by the City in its Department of Planning and Development ("DPD") from June 1, 1999 until his termination on August 5, 2005. (Def.'s 56.1 ¶ 3.) The DPD includes several divisions; one of them, the Administrative Services Division, is comprised of the Office Operations Unit, which manages the DPD's vehicles, equipment, and supplies. The Division also includes the Fiscal Unit, which processes invoices, performs accounting and record keeping, prepares fiscal reports and budgets, reviews contracts, and administers grants. (*Id.* ¶ 4.) David Wells became the Managing Deputy Commissioner in March 2001, and in late 2002, Nikki Bravo, who had been assistant Commissioner of the Administrative Services Division, was assigned to oversee the Fiscal Unit. Bravo reported to Wells until 2007. (Pl.'s 56.1 Resp. ¶ 5.)

In 2001, Plaintiff transferred to the Fiscal Unit as an Accountant IV. In that position, he was primarily responsible for processing vouchers from the DPD's Real Estate Division, securing funding for certain projects, reporting on the DPD's financial position, and preparing budget reports. (Def.'s 56.1 ¶ 6; Pl.'s 56.1 Add'l ¶ 14.) The Real Estate Division "grew," the parties agree, in 2002 or 2003, when the DPD absorbed a real estate division from the Department of Housing and staff from the Department of General Services, resulting in more work for the entire Fiscal Unit. (Pl.'s 56.1 Add'l ¶ 1; Def.'s 56.1 Resp. ¶ 7.) Even before that growth, Tina Drews, who had the title of "Coordinator of Special Projects," occasionally helped to process vouchers when there was a "high volume." (Pl.'s 56.1 Add'l ¶ 12.) Plaintiff suggests that Mr. Wells, the Managing Deputy Commissioner of the DPD, was not sensitive to the Fiscal Unit's workload; although Wells had

_____

[1] Defendant's Rule 56.1(a)(30 Statement of Undisputed Material Facts [99] is cited as "Def.'s 56.1 ¶ ___." Plaintiff's Responses to City of Chicago's Local Rule 56.1(a)(3) Statement [104] is cited as "Pl.'s 56.1 Resp. ¶ ___." Plaintiff's Amended Local Rule 56.1(b)(3) Additional Statement of Uncontested Material Facts [109] is cited as "Pl.'s 56.1 Add'l ¶ ___." Defendants' Response to Plaintiff's Amended Local Rule 56.1(b)(3) Additional Statement [114] is cited as "Def.'s 56.1 Resp. ¶ ___."

worked as an Accountant IV, he did not process vouchers or prepare reports and budgets relating to real estate and was unaware how the expansion of the DPD's Real Estate Division impacted on the volume of vouchers, reports, and budgets that the Fiscal Unit processed. (*Id.* ¶¶ 3, 4.)

The only other Accountant IV in the Unit, Rosendo Mota, was assigned to process vouchers for another DPD division, and to handle revenue and petty cash and work on special reports. Mota's job required creation of monthly reports for all City land sales; transfer of security deposits to the "balance sheet account"; "reconcil[iation of] the accounts to ensure sufficient funds for property taxes"; and transfer of funds to the "voucher account." (*Id.* ¶¶ 7, 66.) Mota testified that three months after he began working in the DPD, Plaintiff assumed most of the real estate work: "I [Mota] was doing the revenue and he [Plaintiff] was doing Real Estate invoices and I was doing invoices for Neighborhoods." Because half of Mota's work was "revenue," he processed only half as many vouchers as Plaintiff did. (Mota Dep., Ex. 4 to Pl.'s 56.1, at 11-12.) Mota noted, further, that Plaintiff was responsible for handling all the "special invoices," a time-consuming project because it required obtaining signatures from several individuals. (*Id.* at 31.) Mota testified that Plaintiff was "great" at getting work done. (*Id.* at 13.) Tina Drews, too, thought Plaintiff had a "very good work ethic. His work was complete. It was always accurate, and as far as [she] knew, it was always on time." (Def.'s 56.1 Resp. ¶ 15.) Plaintiff believed he had more work to do than anyone else, but was nevertheless able to "get it done in a timely manner until they started making unusually tight time frames." (Adams Dep., Ex. 5 to Pl.'s 56.1, at 37.)

The record identifies several individuals as Plaintiff's supervisors. Defendant asserts, and Plaintiff has admitted, that Margaret Wilson was Plaintiff's direct supervisor from February 9, 2002 until March 31, 2004. (Pl.'s 56.1 Resp. ¶ 8.) The parties also agree that from late 2002 until his termination in 2006, Plaintiff reported either directly or indirectly to Nikki Bravo. (Def.'s 56.1 Resp. ¶ 22.) They agree, further, that as of August 2, 2004, Leonard Obilor became the Director of Finance for the Fiscal Unit and was Adams's and Mota's direct supervisor. (Pl.'s 56.1 Resp. ¶ 8.)

When Obilor began working as Director of Finance, he instituted new policies, including a central filing systems for vouchers. Obilor required employees who processed vouchers to include the property's "PIN" number, as well as the property's address, on each voucher.[2] (Def.'s 56.1 ¶ 16.) Obilor also enforced a January 2004 policy requiring that all payment vouchers be processed within five to ten days. (*Id.* ¶ 17.) Plaintiff received a copy of that policy, and, though it took him up to thirty days to process what he characterized as an "irregular invoice," Plaintiff testified that he was able to get his own work done and occasionally volunteered to help his co-workers process their outstanding invoices. (*Id.* ¶¶ 17, 18.) Other changes Obilor instituted included requiring employees who reported to him to get his advance approval before sending e-mails to persons in other divisions, requiring his staff to obtain Obilor's approval before seeking assistance from an intern, and prohibiting Accountant IV's (like Plaintiff) from going to the Comptroller's office, which is in a separate building, to pick up checks. (*Id.* ¶¶ 19, 20, 69.)

Obilor did not confirm Plaintiff's account of an excessive workload. Obilor acknowledged that his employees might complain about their workloads from time to time, but he did not recall any specific complaints from Plaintiff. (Def.'s 56.1 Resp. ¶ 5.) Nor did Obilor specifically compare Plaintiff's workload with that of James Varghese, who ultimately replaced Plaintiff. (*Id.* ¶ 6, citing Obilor Dep., Ex. 6 to Pl.'s 56.1, at 49-50.) The parties agree that Plaintiff's work processing vouchers could be complicated by "funding issues." When such issues arose, Nikki Bravo testified, Plaintiff would not be viewed as "delinquent or tardy in processing that invoice," but was expected to attempt to resolve the issue in a timely manner and, if he was unable to do so, make a note of the difficulties on the invoice when he submitted it to Bravo. (Def.'s 56.1 Resp. ¶ 8, citing Bravo Dep., Ex. 1 to Pl.'s 56.1, at 94-97.)

---

[2] Plaintiff denies that employees were required to include the PIN number on each voucher, but he cites no record evidence, and elsewhere admits that Obilor's policies include this requirement. (*Compare* Pl.'s 56.1 Resp. ¶ 16 *with id.* ¶ 71.) The parties have not explained what a PIN number is in this context.

**Evaluations**

Managers in the DPD "strive[] to complete [formal performance evaluations] every six month for employees," using a form document labeled "Performance Management System." (Pl.'s 56.1 Add'l ¶ 23.) The evaluations were conducted by the employee's immediate supervisor, and reviewed by the supervisor's own supervisor. (*Id.*; Bravo Dep., Ex. 1 to Pl.'s 56.1 at 50-51.) Thus, Nikki Bravo evaluated all employees in the Administrative Services Division either directly or indirectly. (Bravo Dep. at 51.) Bravo recalls having seen a formal evaluation for Plaintiff after the Fiscal Unit came under her supervision, though she does not recall having been the one to give him such an evaluation. (*Id.* at 52-53.) For the first six months of 2002, Plaintiff's performance was ranked between "Very Good" and "Outstanding." ("Performance Management System" document, Ex. 14 to Pl.'s 56.1.)

The only other performance evaluation form that appears in the record is dated April 25, 2005. The form is signed by Plaintiff and by Leonard Obilor but is otherwise incomplete–that is, it contains no evaluation of Plaintiff's performance. ("Performance Management System" document, Ex. 17 to Pl.'s 56.1.)[3] There are no other performance evaluations in the record, but Plaintiff has submitted two pages of handwritten notes of a meeting on May 12, 2005. (Handwritten notes, Ex. 16 to Pl.'s 56.1.) The record does not show who authored notes or maintained the document, but the name David Adams appears at the top of the first page of these notes, and the names "Leonard [Obilor], David [Adams], Nikki [Bravo]" are listed in the left margin. The notes suggest that, as Plaintiff contends, there was a discussion of "payment vouchers and overrides" at this meeting, but the notes do not support Plaintiff's contention that he stated his disagreement with a methodology proposed by Bravo and Obilor. Plaintiff correctly observes that the unidentified note-taker made

---

[3] Plaintiff asserts that Obilor asked him for this form on May 27, 2005, but Plaintiff had already provided it to him (Pl.'s 56.1 Add'l ¶ 26); he cites nothing in the record for that assertion, however, and the court therefore disregards it.

no record of Plaintiff's alleged statement (for which he was later disciplined, as described below), "I am not a secretary." The notes do include the following account:

> Informed David in this meeting that mgmt will not be tolerating his behavior any longer. David was warned that his undesirable, annoying behavior during the course of this meeting would be the last one. David admitted understanding what I meant.

**Plaintiff's Disciplinary History**

Plaintiff characterizes his work performance for the DPD as excellent. (*Id.* ¶ 9.) As Defendant emphasizes, however, Plaintiff was the subject of discipline imposed by five different supervisors during the period from 2002-05. Plaintiff does not specifically challenge this assertion, though he notes that all of that discipline was imposed while Nikki Bravo was the overall supervisor of the Real Estate Division of the DPD. (Pl.'s 56.1 Resp. ¶ 9.) Plaintiff was a member of the American Federation of State, County, and Municipal Employees ("AFSCME") during his employment. The collective bargaining agreement between the City and AFSCME calls for progressive discipline, but Plaintiff denies that the agreement "provides the requisites of applying progressive discipline." He cites the testimony of his co-worker, Rosendo Mota, who served as Union Treasurer, that supervisors "wrote him [Plaintiff] up for four or five different charges simultaneously," but does not specifically explain how the practice of issuing multiple charges is inconsistent with progressive discipline. (Pl.'s 56.1 Resp. ¶ 10; Mota Dep., Ex. 4 to Pl.'s 56.1 Resp., at 19.) Defendant asserts that Plaintiff was entitled to file grievances, but Mota's testimony, and the language of the AFSCME agreement, support a finding that the right to bring a grievance was that of the union, not the individual employee. (*Id.* at 14-17; AFSCME agreement, Ex. 2 to Pl.'s 56.1 Resp., Article 21.)

On May 17, 2002, Jarese Wilson[4] gave Plaintiff a verbal warning that his work assignments

---

[4] In paragraph 11 of its Rule 56.1 statement, Defendant identifies Jarese Wilson as yet another person who acted as Plaintiff's immediate supervisor as of May 17, 2002. (Def.'s 56.1

(continued...)

were three to four weeks past due. (Def.'s 56.1 ¶ 11.) In a confirmatory memo, Ms. Wilson offered to discuss the need for assistance at weekly meetings but warned that absent improvement, there would be further disciplinary action. (Verbal Warning follow-up memo, Exhibit 9 to Adams' Dep, Exhibit C to Def.'s 56.1) Plaintiff points out that his workload had increased when the DPD had taken on responsibilities for the Real Estate Division, an observation confirmed by two co-workers. (Pl.'s 56.1 Resp. ¶ 11, citing Drews Dep. , Pl.'s Ex. 3 at 17-19 and Mota Dep., Pl.'s Ex. 4 at 10.)

Almost a year later, on April 8, 2003, Nikki Bravo issued a written reprimand charging Plaintiff with "discourteous treatment," "insubordination" and "conduct unbecoming." The written reprimand does not elaborate on the nature of the alleged wrongdoing, and Plaintiff denies having engaged in any discourtesy, but admits he did not file a grievance to challenge the reprimand. (Pl.'s 56.1 Resp. ¶ 12.) Five months later, on September 5, 2003, Ms. Bravo issued a three-day suspension, citing the same kind of general misconduct and again providing no details concerning the incident(s) that generated the discipline. Plaintiff again denies any wrongdoing but acknowledges that he did not grieve the discipline. (*Id..* ¶ 13.)

In January 2004, Kivu Robinson, who held the title "Program Auditor III" within the DPD, sent an e-mail message asking Plaintiff to provide him with "a status of all Acquisitions to date that DPD has PAID for any properties." Plaintiff's response began with the words, "Kivu, Actually, the Director of Acquisitions etc., etc., etc. should be tracking all CHA Acquisitions . . . . (but thats [sic] another tale)." (Adams Dep., Pl.'s Ex. 5, Ex. 13.) Defendant characterizes this response as "an improper e-mail to the Director of Acquisitions in the DPD's Real Estate Division." (Def.'s 56.1 ¶ 14.) Plaintiff denies that he was responding to an e-mail from the Director of Acquisitions (Pl.'s 56.1 Resp. ¶ 14),

---

[4](...continued)
¶ 11.) In paragraph 8, however, Defendant asserts that Margaret Wilson was Plaintiff's supervisor from February 9, 2002 through March 31, 2004, and that Jarese Wilson preceded Margaret Wilson as Plaintiff's immediate supervisor. (*Id.* ¶ 8.) Plaintiff denies that Jarese Wilson was his immediate supervisor as of May 17, 2002, and asserts that it was Tyrone Singletary, not Jarese Wilson, who preceded Margaret Wilson as his supervisor. (Pl.'s 56.1 Resp. ¶¶ 8, 11.)

and the material Defendant cites does not support the assertion that Robinson was the Director of Acquisitions.[5]  It is undisputed, however, that Plaintiff sent copies of his message to six other employees (Plaintiff asserts they were the same persons who had received copies of the original inquiry).  (Pl.'s 56.1 Resp. ¶ 14.)  Plaintiff admits, further, that after a January 23, 2004 "pre-disciplinary meeting," he agreed to attend a counseling session (Plaintiff refers to this as a "PSP session") in lieu of discipline, and that he did not pursue a grievance regarding this episode.  (*Id.*)  Another performance episode occurred on April 5, 2004, when Nikki Bravo e-mailed Plaintiff to remind him to process vouchers promptly and to warn him that his behavior at a staff meeting was unacceptable (Plaintiff had taken his shoes off, put his feet up on a chair, and fallen asleep).  In a response the court would characterize as unrepentant, Plaintiff explained that he understood it was an "informal meeting" and that cold medication had made him drowsy.  He also accused Bravo of "intentionally trying to aggravate" him.  (Pl.'s 56.1 Resp. ¶ 15; E-mail exchange, Adams Dep., Ex. 31.)

In August 2004, Plaintiff again sent an e-mail message that drew the attention of his supervisors.  (E-mail chain, Ex. 17 to Adams Dep.)  On August 6, 2004, Blanca Beauchamp of the City's Real Estate Division sent Nikki Bravo a message in which she asked about the status of three checks.  On August 12, Ms. Bravo promised Ms. Beauchamp a prompt status report, and Plaintiff in fact provided it the next day.  His August 13 e-mail message furnished the requested information, but pointed out that "[I]f you [Ms. Beauchamp] would check with Julie Bengston you would find" the requested information.  The message ended with the comment, "By the way, How do you track this information?  I'm sure Julie Bengston makes you aware when she receives checks."  (*Id.*)  Plaintiff

---

[5]      The court presumes that Defendant is referring to one of the other persons who received a copy of Plaintiff's e-mail message, but this is not clear from the record.  Defendant cites pages 171-174 of Adams Deposition, but has furnished copies only of pages 173 and 174, neither of which identify the Director of Acquisitions.  Defendant also cites Exhibit 4 to Adams' Deposition, but that document (Bates No. 00158) is a pre-disciplinary notice which makes no mention of the Director of Acquisitions and does not identify the recipients of Plaintiff's e-mail message.

sent his message to all of the individuals who received copies of Ms. Beauchamp's original request. Jamie Rhee, the Deputy Director of the Real Estate Division, responded, explaining to Plaintiff that "Julie and Bianca do exchange info" but that getting check information from Plaintiff's division was nevertheless helpful. Mr. Rhee concluded his message by saying, "I am not sure why every time we ask for info from you we get a hostile response. I personally do not appreciate the way you respond and to all of the people some of them outside our dept. . . . [S]ince getting checks is your job I am not sure why it bothers you so [to provide information] and [why] you want to refer us a [sic] another dept." (*Id.*) In response to this incident, Obilor conducted a pre-disciplinary meeting, and issued a one-day suspension to Plaintiff for discourteous conduct, insubordination and "conduct unbecoming." (Def.'s 56.1 ¶ 22.)

Yet another incident occurred the following month. On September 23, 2004, Plaintiff left the office without Mr. Obilor's express authorization in order to pick up some checks from the Comptroller's office. Plaintiff claims he did tell Obilor that he was on this way to pick up checks, but that Obilor slammed a door in his face. Although he denies any misconduct, Plaintiff admits that Obilor issued a seven-day suspension for leaving the office without authorization, not following procedure when completing invoices, slamming the door, and yelling across the office when he received his pre-disciplinary notice. (Pl.'s 56.1 Resp. ¶ 23.) He admits, further, that the discipline was imposed for violations of rules prohibiting leaving the office without authorization, discourteous conduct, insubordination, failure to complete assignments, incompetence and inefficiency, and "conduct unbecoming." (*Id.* ¶ 24.)

On November 22, Defendant conducted a predisciplinary meeting to address a number of infractions related to Plaintiff's failure to process and record certain vouchers and to complete an audit in a timely fashion. (Def.'s 56.1 ¶ 25.) Plaintiff insists the charges against him lacked merit:

- Plaintiff was charged with having failed to process certain "invoices with a list of overrides . . . ." He asserts (without a citation to the record) that Obilor initially claimed the violation had occurred on October 7, 2004, while Plaintiff was serving his seven-day suspension, and

9

that Plaintiff did not see the revised notice of discipline, with the corrected date of October 19, 2004, until his deposition in this case. He does not specifically deny failing to complete this project, but contends that he fell behind in his work due to the suspension and was not offered any assistance. (Pl.'s 56.1 Resp. ¶ 25.)

- Plaintiff was charged with failing to process a check request in a timely manner on November 12. Although Plaintiff had properly "set up a funding strip" (a necessary step for processing a check request), he misplaced the check request itself and was unable to find it, despite searching for it on his own desk and those of his co-workers. On Monday, November 15, Obilor himself stepped to Plaintiff's desk and found the missing check request in a stack of papers, so readily that Plaintiff suspects Obilor had planted it there. (*Id.* ¶ 26.)

- On November 16, 2004, Obilor had asked Plaintiff to compile a list of the properties that the City had acquired. Plaintiff admits that the list he prepared left out one of the properties, but characterizes the mistake as "an omission, not an oversight," and observes that it "was caught well in advance" of the November 18 budget meeting. (*Id.* ¶ 27.)

- Defendant asserts that Plaintiff "did not process a payment within the required [five day] time period." (Def.'s 56.1 ¶ 28.) Plaintiff notes Defendant has offered no evidence of any specific voucher request that was not processed in a timely manner (in fact, all that Defendant has cited are pages from Plaintiff's deposition transcript in which he challenges the existence of the five-day rule) and argues that "a five day turnaround is not required or possible." (Pl.'s 56.1 Resp. ¶ 28.)

- Obilor asked Plaintiff to audit the "Strategic Neighborhood Investment Fund" account. (Adams Dep., Ex. C to Def.'s 56.1, at 218.) Although Plaintiff did not complete the audit, he notes that he "was able to provide Obilor with the information to start" it, and observes that for an accountant to audit his own account creates a conflict of interest. (Pl.'s 56.1 Resp. ¶ 29.)

At the conclusion of the November 22 meeting, the DPD imposed a twenty-nine day suspension for "failure to complete assignment" and for "incompetence and inefficiency." Following a grievance, the suspension was reduced to 25 days. Including time away for a pre-scheduled vacation, Plaintiff was away from work from December 2, 2004 through January 7, 2005. (Def.'s 56.1 ¶ 30.)

**Plaintiff's Discharge**

The incident that ultimately led to Plaintiff's discharge occurred on June 15, 2005. The DPD had weekly staff meetings to discuss outstanding issues and vouchers. These meetings were ordinarily scheduled for Wednesdays, but they were sometimes postponed, and the time of the

meeting often changed. (Pl.'s 56.1 Add'l ¶ 16.) At 12:44 p.m. on June 15, 2005, Plaintiff received an e-mail message from another DPD employee reminding him to bring any outstanding vouchers with him to the meeting scheduled for that afternoon at 2:00 p.m. (*Id.* ¶ 27.) Plaintiff appeared at the meeting but did not bring the documents with him. He reported that he was unable to print the vouchers from his computer and had reported the computer problem to "4-DATA," the computer staff in the City's Business and Information Systems Unit ("BIS"). (Def.'s 56.1 ¶¶ 31, 32.) When he learned that Plaintiff did not have relevant documents with him, Obilor angrily demanded that Plaintiff leave the meeting. (Pl.'s 56.1 Resp. ¶ 33.) Tina Drews recalled that Plaintiff and Obilor got into a "shouting match" about the matter and that Obilor "slammed the table with his hand and told David to leave now." (Drews Dep., Pl.'s 56.1 Ex. 3, at 23-24.) Rosendo Mota, similarly, testified that Obilor pounded the desk and told Adams to leave the meeting because Plaintiff "stated that he had forgotten to bring something into the meeting." (Mota Dep., Pl.'s 56.1 Ex. 4, at 22-23.)

Outside of the meeting, Plaintiff told David Wells, the DPD Deputy Commissioner who had previously worked in BIS, that he had called 4-DATA and has been assigned a "ticket number" for repairs to his computer. (Def.'s 56.1 ¶ 34.) Wells later heard Plaintiff in a phone conversation with 4-DATA and concluded (erroneously, according to Plaintiff) that Plaintiff was just then calling 4-DATA for the first time. (*Id.* ¶ 35; Pl.'s 56.1 Resp. ¶ 35.) Wells observed that Plaintiff did not complete the call and surmised that Plaintiff hung up after seeing Wells. (Pl.'s 56.1 Add'l ¶ 32, citing Wells Dep., Ex. 9 to Pl.'s 56.1, at 78.) When Wells asked Plaintiff why he had been asked to leave the DPD staff meeting, Plaintiff initially responded, "I don't know," several times, but ultimately admitted that he was asked to leave the meeting because he did not have necessary documents. (Def.'s 56.1 ¶ 36.) Wells later investigated Plaintiff's claim that he had contacted 4-DATA before the meeting; Wells concluded this was not true, based upon his finding that 4-DATA did not "open a ticket" for Plaintiff's computer repair until 2:58 p.m. on the day of the meeting. (*Id.* ¶ 37.) Defendant notes, further, that in a written statement rebutting disciplinary charges, Plaintiff

himself recalls that he called 4-DATA "[a]fter being literally throw [sic] out of the weekly staff meeting in front of the entire staff . . . ." (Rebuttal of Charges Statement, Exhibit 32 to Adams Dep., Ex. 5 to Pl.'s 56.1.) Wells instructed Leonard Obilor and Nikki Bravo to discipline Plaintiff for dishonesty, and because Plaintiff already had a lengthy disciplinary record, Wells contacted the City's Law Department to initiate the process of discharging Plaintiff. (*Id.* ¶ 38.)

On July 15, 2005, Plaintiff received a "Statement of Charges" notifying him of possible discharge, and placing him on paid administrative leave. (*Id.* ¶ 39.) The charges included (a) that Plaintiff had made discourteous statements to his supervisor: on May 12, 2005, when asked to update a form, Plaintiff allegedly told his supervisor, "I am not a secretary," and on May 27, 2005, when again asked to update the form, he allegedly announced, "It's about to get ugly." (b) that on June 15, 2005, Plaintiff failed to comply with the standard procedure requiring employees to bring a list of outstanding vouchers with them to the DPD's weekly fiscal staff meeting; (c) that Plaintiff had refused to leave the meeting to retrieve the list after Oblilor asked him to do so; and (d) that Plaintiff had made false statements to Wells. (*Id.* ¶¶ 40-43.) Plaintiff submitted a written response, but was discharged. He appealed to the City's Personnel Board; the Board convened a hearing at which Plaintiff was represented by counsel, offered testimony from co-workers, and testified in his own defense. (*Id.* ¶¶ 45, 46.) On May 2, 2006, the Hearing Officer issued his report concluding that the City had proven all but one of the charges; the Hearing Officer noted the evidence that Plaintiff was unable to retrieve the list of outstanding vouchers with him to the meeting because of a computer problem. On June 14, 2006, the Board adopted the Hearing Officer's finding and upheld Plaintiff's discharge. (*Id.* ¶ 47.)

Rosendo Mota, who, as noted, is the Union Treasurer, acknowledged that the union has "very little" influence on the decision whether a worker will face discipline. (Mota Dep., Ex. 4 to Pl.'s 56.1, at 14, 17.) Mota testified at his deposition that it was "unusual" for City managers to level "four or five different charges simultaneously" at a worker, as occurred in Plaintiff's case, and that

a worker facing so many charges is unlikely to prevail at the disciplinary hearing. (*Id.* at 19-20.)

**Plaintiff's Physical Condition**

Plaintiff was diagnosed with HIV in 1993, but did not tell his co-workers or supervisors. (Def.'s 56.1 ¶ 48.)  At an unspecified time, Plaintiff suffered symptoms that included weight loss, excessive urination, and coughing.  (*Id.*)  Plaintiff missed five days of work in 1999 due to shingles, which he believes is related to HIV, but did not report the condition at work.  (*Id.* ¶ 49.) When he did return to work, Plaintiff recalled, he had scars that appeared as dark patches on his face.  (Pl.'s 56.1 Add'l ¶ 35.)  He was not working with Obilor, Wells, or Bravo at the time.   (Def.'s 56.1 ¶ 49.)

In October 2000, Plaintiff was diagnosed with pulmonary hypertension, a condition which he asserts is associated with HIV, and which causes shortness of breath and weight loss.   (*Id.* ¶¶ 50, 51.)  From 2000 until 2001, he wore a pulmonary pump the size of a cigarette package under his clothing. (*Id.* ¶ 51.)   He explained that the pump was extremely painful; it included wires and a needle that pumped medicine into his chest to help him breathe.  (Pl.'s 56. Add'l ¶ 37.)  Plaintiff lost approximately 20 pounds during that year, but it did not affect his work performance.   (Def.'s 56.1 ¶ 51.)  On one occasion before Obilor became Plaintiff's supervisor, Wells observed Plaintiff in pain and asked how he was; Plaintiff replied that he was fine and never told Wells that he has HIV.  Plaintiff recalls that Wells called him into his office on one other occasion before Obilor became Plaintiff's supervisor and questioned him about his health.  (*Id.* ¶ 52; Pl.'s 56.1 Resp. ¶ 52.) At a meeting in Wells's office, Plaintiff told Wells he was wearing a pump and showed it to him. (Pl.'s 56.1 Add'l ¶ 39; Adams Dep., Ex. 5 to Pl.'s 56.1, at 111.)[6]  Some time prior to Plaintiff's July 2001 hospitalization, a receptionist observed that he was in pain and called Plaintiff's doctor to ask

---

[6]    In his Statement of Additional Facts, Plaintiff asserts that from September 2001 to December 2001, he "would visit David Wells to inform Wells that [he] was wearing apparatus like a pump because of a medical condition."  (Pl.'s 56.1 Add'l ¶ 18.)  If this statement suggests more than one meeting with Wells, the court does not adopt it because the material Plaintiff cites–an EEOC investigator's notes of a telephone conversation with Wells–is hearsay.

whether any treatment was available for him.  (Adams Dep. at 111.)

Plaintiff was hospitalized for three days in 2001.  During that time, Betra Shaw, a friend who worked as an Administrative Services officer in DPD, visited Plaintiff after he asked her to pick up some medication for him.  Plaintiff did not tell her what the medication was for, and although Shaw knew that Plaintiff was sick and needed to wear a pump, she did not know what medical conditions he had.  (Def.'s 56.1 ¶ 53.)  Shaw did notify Beverly Giovenco, the DPD Supervisor of Personnel, that she was visiting Plaintiff at the hospital.  (Shaw Dep., Ex. 10 to Pl.'s 56.1, at 19.)  Shaw pointed out that in order to take a medical leave, Plaintiff would have to notify his immediate supervisor.  (*Id.* at 25.) Following the hospitalization, Plaintiff gave Giovenco a one-page printout describing pulmonary hypertension and its causes.  He did not tell her he had HIV and does not know whether she read the material he gave her.   (Def.'s 56.1 ¶ 54.)  The printout lists a number of secondary causes of pulmonary hypertension, one of which is HIV infection.  After 2001, Plaintiff's pulmonary hypertension became asymptomatic.  (*Id.*  ¶ 55; Pl.'s 56.1 Resp ¶ 55.)

Plaintiff did not discuss his health with Nikki Bravo and did not tell Leonard Obilor he has HIV.  (*Id.* ¶ 56.)  Although she did not know "for a fact" whether Nikki Bravo or David Wells were aware that Plaintiff was sick, Betra Shaw testified that DPD staff "seemed to know" of Plaintiff's hospitalization.  She noted that at some unidentified time, the people who "worked around him" asked about Plaintiff's well-being, and that she personally observed his weight loss between July 2000 and July 2001. (Shaw Dep., Ex. 10 to Pl's 56.1, at 18, 27.)  The parties agree that weight loss does not mean that some one has HIV, but Plaintiff notes that weight loss is in fact a symptom of HIV.  (Pl.'s 56.1 Resp. ¶¶ 57, 58.)

On July 21, 2005, while Plaintiff was on administrative leave pending discharge, he gave Beverly Giovenco a note stating that he was receiving HIV treatment.   Giovenco does not remember showing the note to anyone other than Nikki Bravo.  (*Id.* ¶ 59.)  It is undisputed that apart from five days in 1999, when he suffered from shingles, and three days in 2001 when he was

hospitalized, Plaintiff never missed work due to HIV.  (*Id.* ¶ 60.)

**Work Environment**

Leonard Obilor required DPD Fiscal Unit employees to complete work to his specifications. It is undisputed that in addition to issuing discipline to Plaintiff, Mr. Obilor called Rosendo Mota, Tina Drews, and Linda Casper into his office to tell them their work must be re-done.  (Def.'s 56.1 ¶ 67.)  He also disciplined Linda Casper by way of an oral reprimand and counseling "for failure to establish vendor codes and failure to follow procedure."  And he disciplined James Varghese, who replaced Plaintiff as an Accountant IV, by way of a written reprimand (and perhaps by way of one or two counseling sessions) for unprofessional conduct and poor performance.  (*Id.* ¶ 68; Pl.'s 56.1 Add'l. ¶ 34; Obilor Dep., Ex. 6 to Pl.'s 56.1, at 148-151.) Defendant acknowledges, however, that Plaintiff was the only employee in the Fiscal Unit under Obilor's direct supervision who was disciplined by way of a suspension.  (Def.'s 56.1 Resp. ¶ 34.)   Plaintiff believed some of the policies instituted by Obilor (described above) were directed only at him; for example, Plaintiff was required to report to Obilor when he needed to leave the office to use the restroom, a rule that Plaintiff believes applied to him alone.  (Pl.'s 56.1 Resp. ¶¶ 69, 70.)  He admits, however, that other polices imposed by Obilor applied to the entire Fiscal Unit, including the central filing policy, the requirement that vouchers be processed in five to ten days and that PIN numbers be included on them, and the requirement that employees obtain Obilor's permission before working with an intern or sending an e-mail to another department.  (*Id.* ¶ 71.)

There were as many as three interns working at DPD at any given time.  One of those interns, Jason Rivas, was there for a very brief period, from December 2004 until January 2005, when he resigned due to his perception that the atmosphere was negative.  (*Id.* ¶¶ 72, 73.) Because Plaintiff was suspended from work in December 2004, Rivas worked with him only in January 2005.  Rivas never discussed Plaintiff's health with him, and at the time of his deposition, had no specific recollection of any derogatory comments about Plaintiff or any comments from any

City employees about Plaintiff's HIV status.  (Rivas Dep. at 27-28, 39.)

**Plaintiff's Charge of Discrimination**

On December 15, 2004, while he was serving his 25-day suspension, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging that the City discriminated against him based upon its perception that he suffered from HIV by imposing suspensions on August 19, October 1, and December 2, 2004.  (Def.'s 56.1 ¶ 61.)  The City received notice of the IDHR charge in January 2005, and Ms. Bravo, Ms. Giovenco, and Mr. Obilor appeared at a fact-finding conference on that charge on July 13, 2005.  (*Id.* ¶ 62.)

Defendant contends that Bravo, Giovenco, Obilor, and Wells first learned that Plaintiff has HIV at that time, but Plaintiff urges that Bravo and Obilor "suspected that plaintiff had HIV/AIDS sometime in December 2004 or before."  He cites the affidavit of Jason Rivas, an intern briefly employed at DPD, who asserted that on January 7, 2005, he "overheard a private conversation between Nikki Bravo and Leonard Obilor" in which Ms. Bravo stated, "I just don't want that in this office, I think he has AIDS," and Mr. Obilor responded by saying, "he'll be out of here right after he gets back."  Rivas's affidavit is undated, but he faxed it to Lydia Williams, whom Plaintiff identifies as employed by IDHR, on April 3, 2006.  (Pl.'s 56.1 Resp. ¶ 62, citing Rivas Dep., Ex. 11 to Pl.'s 56.1 Resp. and fax cover sheet, Ex. 12 to Pl.'s 56.1.)  At the time of his May 2009 deposition, though he had no reason to believe that the information in his affidavit was not true, Rivas no longer had any recollection of this overheard conversation.  (Rivas Dep., Ex. O to Def.'s 56.1, at 19, 27.)  Plaintiff testified that Jason Rivas had told him about a "kind of not cool" conversation that Rivas had overheard, but he made no mention of this matter in any of his charges of discrimination.  (Def.'s 56.1 ¶ 64.)  On August 8, 2005, Plaintiff filed a second charge with IDHR, alleging that Defendant retaliated against him for filing the December 2004 charge when it placed him on administrative leave in July 2005 and ultimately terminated him.  (Def.'s 56.1 ¶ 63.)

**<u>DISCUSSION</u>**

In his Third Amended Complaint, Plaintiff charges the City with violating the Americans with Disabilities Act by intentionally discriminating against him because he is HIV-positive (Count I) or because the City perceived him to have a disability that impaired his performance of one or more major life activities (Count II). In Count III, Plaintiff asserts that his supervisors created a hostile work environment by making multiple false accusations against him, by subjecting him to different rules and procedures than other employees, by assigning him more work than other employees, and by humiliating him in front of his co-workers. Finally, in Count IV, Adams alleges that the City retaliated against him for filing charges with IDHR in December 2004. He notes that the decision to place him on administrative leave pending termination was made on July 15, 2005, just two days after he and his managers appeared at a fact-finding conference before the IDHR.

Defendant seeks summary judgment on each of these claims. Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party, who must go beyond mere allegations and "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). "On a motion for summary judgment, the district court must construe all facts and draw all reasonable inferences in favor of the non-movant." *Srail v. Village of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

**Count I - Intentional Discrimination on the Basis of Disability**

In Count I, Adams claims that the City intentionally discriminated against him on the basis of his HIV-positive status. To recover under the ADA, Adams must be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . .." 42 U.S.C. § 12111(8) (2006). A plaintiff has a disability under the ADA if he has "[1] a physical or mental impairment that substantially limits one

17

or more of the major life activities of such individual; [2] a record of such an impairment; or [3][is] regarded as having such an impairment." *Id.* § 12102(2) (2006). The threshold issue here is whether Adams has a disability within the meaning of the ADA. The City insists he does not. Positive HIV status is not a "per se disability" under the ADA, *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 445 (7th Cir. 2008) and a person who is HIV positive must present evidence that his status impaired a major life activity. There is no such evidence in this record, the City urges.

In responding to this argument, Plaintiff relies exclusively on the 2008 Amendments to the ADA, which appeared to broaden the definition of disability that had been adopted by the courts. Adams filed his suit prior to the enactment of the 2008 Amendments, however, and it is not applied retroactively. *Kiesewetter v. Caterpillar, Inc.*, No. 08-2149, 295 Fed. Appx. 850, *1 (7th Cir. 2008), citing *Landgraf v. USI Film Products*, 511 U.S. 244 (1994); *Pennie v. United Parcel Service, Inc.*, No. 07 C 1596, 2009 WL 855787 (N.D. Ill. Mar. 30, 2009). Under the pre-2008 Amendments law, the Seventh Circuit has explained that a plaintiff's HIV-positive status "is an impairment, not a disability" and that a person who is HIV positive "is only disabled within the meaning of the ADA if he can show that HIV infection substantially affects a major life activity." *Sanchez v. City of Chicago*, 2007 WL 647485 (N.D. Ill. Feb. 28, 2007) (citing *Bragdon,* 534 U.S. at 630–31); *see Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 194 (2002) ("having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity.") To meet this test, Plaintiff's HIV-positive status must have rendered him "unable to perform a major life activity that the average person in the general population can perform or . . . significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier,* 472 F.3d at 937 (citing 29 C.F.R. § 1630.2(j)(1)(i)–(ii)).

HIV infection can cause a variety of health complications and can lead to the onset of AIDS, which results in more serious illnesses and death. *See* HIV/AIDS Basics,

http://aids.gov/basic/overview/index.html (last visited March 29, 2010). Plaintiff Adams suffered from shingles in 1999 and was treated for pulmonary hypertension in 2000-01, both conditions he asserts to be results of his HIV status. The bout with shingles in 1999 left visible marks on his face, and he underwent painful treatment over several months for pulmonary hypertension–a condition that resulted in shortness of breath and weight loss. Apart from these two undoubtedly challenging episodes, however, Plaintiff has presented no evidence that his HIV status substantially limits him in any major life activity. Unpleasant as those experiences undoubtedly were, there is no evidence that they imposed any continuing restrictions after 2001. Plaintiff's pulmonary hypertension has been in remission since then, and he has had no reported further episodes of shingles.

Nor has Plaintiff presented evidence that he is significantly restricted in any major life activity. On this score, Plaintiff asserts that his "bodily function of reproducing is substantially limited," (Plaintiff's Memorandum in Opposition to Summary Judgment, at 6), but he cites no record evidence to support this assertion. Instead, Plaintiff relies on general language from *Bragdon v. Abbott*, 524 U.S. 624 (1998) and *Contreras v. Suncast Corp.*, 237 F.3d 756 (7th Cir. 2001). In *Contreras,* the plaintiff contended he was terminated in violation of his rights under the ADA, but the Seventh Circuit concluded that his assertion of sexual difficulties–specifically, a change in the frequency with which he could engage in sexual intercourse–without any specific documentation, did not constitute an impairment that substantially limited a major life activity. 237 F.3d at 764. In *Bragdon,* a dentist had refused to treat plaintiff, who suffered from an as-yet-asymptomatic HIV infection. The Court addressed substantial medical evidence and plaintiff's own "unchallenged" testimony in support of its holding that plaintiff suffered from an impairment which substantially limits the major life activity of reproduction. 524 U.S. at 641. Both of these cases pre-date *E.E.O.C. v. Lee's Log Cabin,* where the Seventh Circuit explicitly rejected the argument that HIV-positive status is a per se disability because of its effect on reproduction. 546 F. 3d 445. In this case, where there is not a shred of evidence that HIV imposed limitations on Plaintiff's ability to

reproduce–not even his own testimony on the matter–a conclusion in his favor on this claim would require the court to adopt the argument that the *Lee's Log Cabin* court specifically rejected.

Plaintiff's alternative argument–that his HIV status substantially limits him in the major life activity of working–fares no better. The Seventh Circuit notes that any case resting on the theory that plaintiff is limited in the major life activity of working would require a showing of inability to work in a "broad range of jobs." *See E.E.O.C. v. Schneider National, Inc.,* 481 F.3d 507, 511 (7th Cir. 2007), quoting *Toyota Motor Mfg., Inc. v. Wiliams,* 534 U.S. 184, 200 (2002). Plaintiff here has made no attempt to make such a showing and offers no evidence that he has any limitations at all in his ability to work. His reliance on *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) in this regard is a nonstarter. Noting, among other circumstances, the fact that the plaintiff had been hospitalized years earlier for the same condition, *Arline* held that a person suffering from tuberculosis may be handicapped within the meaning of § 504 of the Rehabilitation Act. As several courts have recognized since *Arline*, however, the idea that any hospital stay, however brief or remote, is sufficient to establish disability status, is "nonsensical." *See, e.g., Taylor v. United States Postal Service*, 946 F. 2d 1214, 1217 (6th Cir. 1991).

Nor can Plaintiff point to any other evidence that his HIV-positive status interfered with the major life activity of working. His work attendance was nearly perfect; the evidence here is that he had only eight days of health-related absences over a period of six years. And in Plaintiff's own estimation, as well as that of at least some of his co-workers, his work performance was beyond challenge. Plaintiff characterized his work as excellent at all times; Tina Drews said he was "always accurate;" and Rosando Mota said he was "great" at getting things done. This testimony undermines any suggestion that Plaintiff was unable to work in a broad range of jobs. Plaintiff has not established that he is disabled within the meaning of the pre-Amendments version of ADA, and Defendant is entitled to summary judgment on Count I.

**Count II - Discrimination on the Basis of Perceived Disability**

Even if Plaintiff does not suffer from a condition that substantially limits him in a major life activity, he can still claim protection under the Act if he can show that Defendant regarded him as disabled.  To survive summary judgment under this theory (again, under the law as it existed prior to the 2008 amendments), Plaintiff would have to show that his supervisors perceived him to be substantially limited in a major life activity.  *Amadio v. Ford Motor Co.,* 238 F.3d 919, 920 (7th Cir. 2001).  Plaintiff asserts that his supervisors perceived him as unable to do his job, but nothing in this record supports the notion that his supervisors' criticisms of his performance had anything to do with their perceptions concerning his physical condition.  He notes that his supervisors knew of his absences and observed his symptoms.  Defendant points out none that of Plaintiff's three supervisors–Obilor, Bravo or Wells–worked with him in 1999 when he was hospitalized for shingles. Wells was his supervisor in 2001, when Plaintiff was hospitalized briefly and then underwent several months of painful treatment for pulmonary hypertension.  But Wells's awareness of Plaintiff's absence and treatment in 2001 is not equivalent to a perception that Plaintiff was impaired in any major life activity years later.

*Sanglap v. LaSalle Bank*, 345 F.3d 515 (7th Cir. 2003), cited by Plaintiff, is not to the contrary.  In that case, the defendant bank closed the plaintiff's account after he suffered several seizures in the bank lobby.  His ADA claim failed, and defendant sought an award of fees in its favor, noting that the plaintiff had pursued the claim even after it became clear that the bank had not learned that he suffered from epilepsy until after it closed his account.  The Seventh Circuit denied the bank's request for fees, observing that "liability for disability discrimination does not require professional understanding of the plaintiff's condition.  It is enough to show that the defendant knew of symptoms raising an inference that the plaintiff was disabled." 345 F.3d at 520. As the court noted, a bank employee who observed seizures could have inferred that the plaintiff suffered from epilepsy or another disability.  In this case, Plaintiff points to no symptom from which his employers would likely have inferred that he suffered from any condition that substantially

interfered with major life activities.

The only remaining evidence in support of a "regarded-as"-disabled claim is the disputed testimony of Jason Rivas. Rivas, employed as an intern with the City for barely two months, signed an affidavit asserting that he overheard a conversation between Bravo and Obilor in which Bravo said she "didn't want that in this office" because she "[thought] he had AIDS," and Obilor assured her that "he" would be gone soon. Though he made no mention of this matter in his charge of discrimination, Plaintiff now claims Rivas reported this conversation to him soon after it happened–presumably, during the period of approximately one month after Plaintiff returned from his 25-day suspension and before Rivas resigned.

Defendant asks the court to strike the affidavit from the record as inconsistent with Rivas's deposition testimony, but as Plaintiff notes, the fact that Rivas now has no recollection of the Bravo/Obilor conversation is not truly inconsistent with his sworn affidavit. The court concludes that Rivas's affidavit is nevertheless too slim a reed to support Plaintiff's claim. First, it is not clear that Bravo's expression of animus (assuming it was made) was in fact aimed at Plaintiff. Even under Rivas's version, Plaintiff's name was not mentioned. Nor is there any evidence that anyone in the office ever believed or advised Bravo that Plaintiff suffers from AIDS. Plaintiff himself never reported his HIV-positive status to anyone, and he presented no evidence that any of his co-workers, let alone Bravo or Obilor, so much as harbored a suspicion about the matter. Finally, whatever Bravo may have intended or believed as of January 7, 2005, neither she nor Obilor took any action against Plaintiff for several more months, despite insubordinate comments on May 12 and again on May 27, 2005. In June 2005, after another incident of what his managers viewed as insubordinate and dishonest conduct, they finally initiated the termination process.

Plaintiff has not established that he suffers from a disability within the meaning of ADA, nor has he presented evidence sufficient to support a finding that his supervisors regarded him as disabled. Defendants are entitled to summary judgment on Count II.

**Count III - Hostile Work Environment**

Count III of Adams's complaint alleges that from August 2004 until his discharge in August 2005, his supervisors harassed him to such an extent that it created a hostile work environment. The Seventh Circuit has not decided whether a claim of hostile work environment is actionable under the ADA, *see Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009), and the court's conclusion that Plaintiff does not suffer from a disability arguably defeats this claim without further discussion. The court nevertheless observes that the evidence does not establish the "subjectively and objectively . . . severe and pervasive" conduct necessary to support such a claim. *Mannie v. Potter,* 394 F.3d 977, 982 (7th Cir. 2005); *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 975 (7th Cir. 2004). In assessing the work environment, the court must consider "all of the circumstances, including the frequency and severity of [the challenged] conduct, whether it [wa]s threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interfere[d] with an employee's work." *Wyninger*, 361 F.3d at 975–76; *see Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1145 (7th Cir. 1997) (important to consider not only what the employer did, but what actions it did not take). "[R]elatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 533 (7th Cir. 1993).

Plaintiff complains about his supervisors' harassment from August 2004 until his discharge. During that period of time, he was disciplined on four occasions, each time after notice and a pre-disciplinary hearing. In three of the incidents, Plaintiff was disciplined for unchallenged violations of universally-applicable rules: an inappropriate e-mail message to a superior; leaving the DPD office without approval; and failure to perform an assigned task. In the final incident, Plaintiff was unprepared for a staff meeting, and Obilor angrily ejected him from the meeting. Measured discipline for legitimate rules violations and a single angry outburst does not constitute severe or pervasive conduct. *See Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559 (7th Cir. 2009) (criticisms,

performance evaluations, and psychological evaluations do not amount to a hostile environment); *Ezell v. Potter*, 400 F.3d 1041 (7th Cir. 2005) (verbal outbursts that never became physically threatening are insufficient to create a hostile environment). And it is undisputed that the alleged harassment never interfered with Plaintiff's work performance, which remained, in his own assessment, excellent. *See, e.g.,Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000)(among the factors to be considered in assessing a hostile environment claim is whether alleged harassment unreasonably interfered with the employee's work performance). Defendant is entitled to judgment as a matter of law on the hostile work environment claim.

**Count IV - Retaliation**

On December 15, 2004, Plaintiff filed a charge of discrimination with the IDHR. On June 15, 2005, he was placed on administrative leave pending termination. In Count IV of his complaint, Plaintiff alleges that the termination proceedings were in retaliation for his charge of discrimination. Defendant seeks summary judgment on this claim as well.

To prove a claim of retaliation, Adams must establish that he engaged in a protected activity and suffered an adverse employment action as a result, or that similarly-situated employees who did not engage in a protected activity were treated more favorably. *See Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744, 758–59 (7th Cir. 2006) (describing the direct and indirect methods of proof for retaliation claims). Plaintiff can prevail under the direct method by presenting evidence (1) that he engaged in a statutorily protected activity; (2) that he suffered an adverse employment action; and (3) of a causal connection between the two. *Squibb v. Mem'l Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007). The causation element requires Plaintiff to present evidence that Defendant would not have terminated him "but for" his IDHR Charges. *See Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 904 (7th Cir. 2005) (citing *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1008 (7th Cir. 2002)). "[S]uspicious timing alone rarely is sufficient to create a triable issue" of fact on this issue. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 665 (7th Cir. 2006) (quoting *Moser,* 406

F.3d at 905); *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 506 (7th Cir. 2004) ("By itself, temporal proximity would not normally create an issue of material fact as to causation . . .."); *cf. King v. Preferred Technical Group*, 166 F.3d 887, 893 (7th Cir. 1999) (evidence that termination followed the employee's protected activity by just one day sufficient to survive summary judgment).

In the alternative, Plaintiff can establish a claim of retaliation under the indirect method by showing that (1) he engaged in a statutorily protected activity; (2) he was meeting his employer's legitimate expectations; (3) he suffered a materially adverse employment action; and (4) he was treated less favorably than a similarly situated employee. *Hilt-Dyson,* 282 F.3d at 465; *Hudson v. Chicago Transit Authority,* 375 F.3d 552, 560 (7th Cir. 2004). As in this case, where the employer offers evidence of a non-retaliatory reason for the adverse employment action, a plaintiff seeking to prove retaliation under either method must show that the employer's proffered reasons were pretextual. *Hudson*, 375 F.3d at 561; s*ee also Argyropoulos v. City of Alton,* 539 F.3d 724, 736 n.6 (7th Cir. 2008) ("[A]n employee's failure to cast doubt on an employer's nonretaliatory explanation will . . . doom a retaliation claim under the direct method.")

The evidence defeats Plaintiff's retaliation claim under either of these methods of proof. Adams engaged in protected activities by filing his IDHR charge in December 2004 and was terminated more than six months later. The six-month gap is far too great to support an inference of causation under the direct method of proof. *See, e.g., E.E.O.C. v. Yellow Freight Sys.,* 253 F.3d 943, 952–53 (7th Cir. 2001) (en banc) (six-week gap between filing of EEOC charge and termination insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.,* 139 F.3d 1155, 1158 (7th Cir. 1998) (one month between employee's filing of EEOC charge and her discharge insufficient to link filing of charge to termination without other evidence). Plaintiff notes that the formal notice of discharge was issued on July 15, 2005, just two days after he and his managers appeared at the IDHR fact-finding conference in July 2005, but it is undisputed that the termination process began a month earlier, when Plaintiff appeared at a meeting without

information that Obilor had requested and later made statements that David Wells believed to be dishonest.

Nor can Plaintiff prevail under the indirect method of proof. He has not identified any co-worker treated more favorably, and his evidence that he was performing adequately relies exclusively on his own assessment and those of some co-workers. Most significantly, Plaintiff has offered no evidence that casts any doubt on Defendant's nonretaliatory explanation for the discharge decision. Although he challenges the wisdom or propriety of Obilor's management decisions, he does not effectively rebut charges that he violated work rules. Similarly, though he denies that any of his statements to Wells on June 15 were untruthful, he offers nothing that suggests Wells did not genuinely believe that he had been dishonest. To show pretext, a plaintiff needs to present some evidence that the purported basis for the adverse action was a dishonest explanation. *See, e.g., Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir.2008 (pretext "means a dishonest explanation, a lie rather than an oddity or an error")(internal quotes omitted); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir.2006) (plaintiff must show that the employer "lied about its reasons for firing him–not that [the employer] was wrong for firing him for the reasons it gave"); *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir.2001) (so long as the employer "honestly believes the reason it offers," the court will not sit as a "superpersonnel department").

The record here shows that Plaintiff had a long history of discipline at the hands of a number of supervisors. His failure to bring requested materials to the June 15 meeting and apparently dishonest comments to Wells were the final straw. Nothing about these circumstances creates a suspicion that supervisors were motivated by a charge filed months earlier. Defendant is entitled to summary judgment on this claim, as well.

## **CONCLUSION**

Defendant's motion for summary judgment [100] is granted.

ENTER:

Dated:     March 30, 2010

REBECCA R. PALLMEYER
United States District Judge